STATE OF NORTH CAROLINA v. WILLIAM TODD ANTHONY

183A00

(Filed 18 December 2001)

## 1. Appeal and Error— preservation of issues—constitutional arguments—not raised at trial

Constitutional components to assignments of error were not preserved for appellate review where they were not preserved at trial, not argued on appeal, and no supporting cases were cited.

## 2. Discovery— evidence admissible under Rules 803, 804 and 404

The trial court did not abuse its discretion in a capital prosecution for first-degree murder by denying defendant's motion to compel disclosure of evidence the State intended to offer pursuant to N.C.G.S. § 8C-1, Rules 803(24), 804(b)(5), and 404(b). Rules 803(24) and 804(b)(5) contain notice requirements and an order compelling disclosure would be redundant; moreover, the State here provided the particulars of the hearsay statements to defendant and defendant did not move to continue or assert surprise. Rule (404)(b) is not a discovery statute and there is no support for the assertion that disclosure of Rule (404)(b) evidence is required.

## 3. District Attorneys— recusal—former defense attorneys joining prosecutor's office

The trial court in a capital prosecution for first-degree murder properly denied defendant's motion to recuse the district attorney's office because two of defendant's attorneys at the public defender's office had joined the district attorney's office. The two attorneys were reassigned by the public defender's office before they obtained confidential information, neither discussed the case with other prosecutors at their new employment, and the attorneys acted properly in avoiding all contact with the case after changing jobs. Defendant failed to show the actual conflict of interest required by *State v. Camacho*, 329 N.C. 589.

## 4. Jury— selection—instructions—capital sentencing

The trial court did not err in a capital prosecution for first-degree murder by denying defendant's motion for instructions explaining the capital sentencing process to prospective jurors.

**STATE v. ANTHONY**

[354 N.C. 372 (2001)]

The instruction given was in accord with pattern jury instructions previously approved and correctly instructed prospective jurors as to the law governing the capital sentencing process.

**5. Criminal Law— sequestration of witnesses—lack of specificity in motion—better practice**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder by denying defendant's motion for sequestration of witnesses where defendant gave no specific reason to suspect that the State's witnesses would tailor their testimony to fit a consensus, defendant did not point to any instance in the record where a witness conformed his or her testimony to that of another witness, and defendant argued on appeal only that the trial court was biased because facilities were available to sequester the witnesses. However, it was noted that the better practice is to sequester witnesses on the request of either party unless there is a reason not to do so. N.C.G.S. § 15A-1225.

**6. Jury— selection—capital trial—rehabilitation**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder by denying defendant's request to rehabilitate prospective jurors where the jurors sooner or later unequivocally stated that they could not recommend the death penalty under any circumstances.

**7. Criminal Law— improper comments by court—not established**

The defendant in a capital prosecution for first-degree murder did not establish that the trial court improperly expressed an opinion or made inappropriate comments. N.C.B.S. §§ 15A-1222, 15A-1230.

**8. Evidence— hearsay—excited utterance—homicide victim's last statements**

Statements by a first-degree murder victim begging for her life and expressing concern for her children were spontaneous and fell within the excited utterance exception to the hearsay rule.

**9. Evidence— hearsay—statement admitted for another purpose**

A statement in a first-degree murder prosecution from the victim's mother that the victim had not wanted her estranged hus-

band (defendant) to see their children before they left for school because it was upsetting to them was not hearsay where it was admitted because it was offered to explain the grandfather's action in keeping defendant from the children on the morning of the killing rather than to establish that the children became agitated. Moreover, the grandfather's actions contributed to defendant's motive for the shooting later that day.

**10. Evidence— hearsay statement by murder victim to officer—restraining order against her husband—state of mind exception**

Statements by a first-degree murder victim to an officer concerning a restraining order against her estranged husband (defendant) and her intent to go to court the next day to get it extended related directly to a feared confrontation with defendant and were properly admitted as evidence of the victim's state of mind, her then-existing plan to engage in a future act, and to show a relationship with defendant contrary to defendant's version. The probative value of the evidence outweighed any potential prejudice.

**11. Evidence— habit—speculation into thoughts**

There was no prejudicial error in a prosecution for first-degree murder in the admission of testimony that the victim expected her estranged husband (defendant) to return their children to their grandparent's house. Although there was sufficient evidence of habitual behavior in picking up and dropping off the children to satisfy N.C.G.S. § 8C-1, Rule 406, this question invited speculation into the victim's thoughts rather a description of her actions. However, there was no prejudice in light of the evidence against defendant.

**12. Evidence— testimony by officer concerning domestic violence protective order—not a legal opinion**

The trial court did not err in a first-degree murder prosecution by admitting the testimony of an officer concerning a domestic violence protective order taken out against defendant where the officer described the evidence available to him at the time, paraphrased the statute in neutral terms, and gave an opinion that the facts provided to him by the victim's father provided probable cause for arrest. He was offering an explanation of his actions rather then an interpretation of the law.

**13. Appeal and Error— preservation of issues—evidence else-where admitted without objection—cross-examination**

The admission of evidence concerning a bumper sticker on defendant's truck was properly preserved for appeal where the State contended that defendant waived review by not objecting to the same evidence during the State's cross-examination of defendant. Defendant did not waive his objection by seeking to explain, impeach, or destroy the value of the evidence by explaining the bumper sticker's meaning on cross-examination.

**14. Evidence— bumper sticker on defendant's truck—not relevant—not prejudicial**

Testimony about a bumper sticker on a truck driven by the defendant in a first-degree murder prosecution was not prejudicial where there was no indication that defendant placed the bumper sticker on the truck and the testimony about the bumper sticker did not go to prove the existence of any fact of consequence to the determination of defendant's guilt, but the evidence of defendant's guilt was overwhelming.

**15. Appeal and Error— preservation of issues—evidence else-where admitted without objection**

A defendant in a first-degree murder prosecution waived appellate review of whether the trial court erred by allowing the State to ask a witness about a 911 call where the 911 recordings were played in their entirety without objection.

**16. Witnesses— redirect examination—scope—wounds not instantly fatal**

There was no prejudice in a first-degree murder prosecution where the court overruled defendant's objection to testimony from a pathologist on redirect examination that the victim's wounds were not instantly fatal. Although defendant had asked on cross-examination whether the wounds were of equal severity and did not seek information about the length of time the victim remained conscious, the State on redirect asked only three questions on this topic, one of the answers was only partially responsive, and there was evidence from other witnesses that the victim remained conscious for several minutes after being shot. There was no prejudice from this abbreviated exchange.

### 17. Evidence— testimony of deputy of clerk of court—personal knowledge

There was no error in a first-degree murder prosecution from the admission of testimony from a deputy clerk about a complaint and motion for a domestic violence protective order filled out by the victim before her murder. The testimony was competent and helpful to the jury and, although defendant argues that the clerk lacked personal knowledge, he cites no testimony to support his contention and it is apparent from the testimony that she did possess personal knowledge.

### 18. Appeal and Error— preservation of issues—no offer of proof after objection

The trial court did not err in a first-degree murder prosecution by sustaining the State's objections to the testimony of defendant's psychiatric expert about alcoholism, Xanax, and addiction where defendant made no offer of proof.

### 19. Trials— objection—not sustained before jury

There was no error in a first-degree murder prosecution where defendant contended that the court erroneously sustained the State's objection to a question to an expert psychiatrist on voir dire, but the record indicates that the court did not sustain the State's objection when it was asked in the presence of the jury.

### 20. Evidence— evidentiary errors—cumulative effect

The cumulative effect of alleged evidentiary errors in a capital first-degree murder prosecution did not deprive defendant of a fair trial where the Supreme Court did not, in fact, find such errors.

### 21. Evidence— relevancy—first-degree murder—threats by victim—self-defense not alleged

The trial court did not err in a capital first-degree murder prosecution by excluding testimony from defendant's mother about statements made by the victim where defendant did not assert self-defense. Alleged threats by the victim were not relevant.

**22. Appeal and Error— preservation of issues—opened door— no objection to same evidence**

A first-degree murder defendant lost the benefit of his objection to testimony that defendant had been known to torment and kill cats when growing up where defendant had opened the door by asking the witness whether she had ever known defendant to be violent; furthermore, defendant did not object to admission of the same testimony from a psychiatrist.

**23. Evidence— rebuttal questions—within the scope of rebuttal**

The trial court did not abuse its discretion in a prosecution for first-degree murder by overruling defendant's objections to rebuttal testimony where defendant argued that the prosecutor exceeded the scope of rebuttal. The challenged questions were properly formulated to rebut matters presented during defendant's case-in-chief. N.C.G.S. §15A-1226.

**24. Witnesses— hypothetical—witness who had examined defendant**

There was no error in a first-degree murder prosecution where the State was allowed to ask one of its rebuttal witnesses, Dr. Robbins, hypothetical questions which defendant alleged were not proper for an expert who had examined defendant. There is no authority for the contention that these questions should not have been asked, and the questions were based upon facts supported by the evidence, the answers were not so equivocal as to render them without probative value, and the responses did not improperly embrace legal terms.

**25. Evidence— cumulative effect—not prejudicial**

The cumulative effect of any erroneous evidentiary rulings during a capital first-degree murder prosecution did not entitle defendant to a new trial given the greater weight of evidence against defendant.

**26. Criminal Law— prosecutor's argument—based on evidence—voice of community**

The trial court did not err by not intervening ex mero motu during two portions of the prosecutor's closing argument in the guilt phase of a capital first-degree murder prosecution where the first portion of the argument quoted testimony verbatim and was therefore based on the evidence, and the second portion of the

argument merely reminded the jury that it was the voice of the community.

### 27. Criminal Law— flight—evidence sufficient—instruction proper

The evidence was sufficient to support an instruction on flight in a capital first-degree murder prosecution where defendant entered his car immediately after shooting the victims, drove quickly from the crime scene without rendering assistance or seeking to obtain medical aid for the victims, and passed one officer without flagging him down. This evidence was sufficient to show that defendant did more than merely leave the scene of the crime; furthermore, the court's instruction accurately informed the jury that proof of flight alone was insufficient to establish guilt and would not be considered as evidence of premeditation and deliberation.

### 28. Criminal Law— prosecutor's argument—victim's experience

The trial court did not err in a capital sentencing proceeding by not intervening ex mero moto when the prosecutor asked jurors to think of what the victim went through as she lay dying. The prosecutor focused on what the victim may have been thinking and the argument was based upon the evidence at trial, did not manipulate or misstate the evidence, and did not urge the jurors to put themselves in the victim's place.

### 29. Criminal Law— defendant's argument—reading from appellate opinion

The trial court did not err in a capital sentencing proceeding by sustaining the State's objection to portions of defendant's closing argument in which his counsel sought to read the facts and the holding from a North Carolina Supreme Court case regarding the especially heinous, atrocious, or cruel aggravating circumstance.

### 30. Sentencing— capital—aggravating circumstance—hindering government function

The trial court did not err in a capital sentencing proceeding by submitting to the jury the aggravating circumstance that the murder was committed to disrupt or hinder the lawful exercise of a governmental function where a domestic violence protective order had been issued after the victim had filed a complaint against defendant, the victim was scheduled to return to court

the next day to obtain an extension, defendant was aware of the hearing and had asked that the date be changed, statements by defendant both before and after the shooting reflected his belief that the victim was keeping his children from him, and a restraining order so upset defendant that he ripped the papers and threw the pieces at the door of the victim's apartment. The jury could reasonably find that one reason defendant killed his wife was to stop this proceeding. N.C.G.S. § 15A-2000(e)(7).

### 31. Sentencing— capital—aggravating circumstance—victim's exercise of official duty as witness

The trial court did not err in a capital sentencing proceeding by submitting the aggravating circumstance that the murder was committed because of the victim's exercise of her official duty as a witness where she had previously obtained an ex parte domestic violence protection order, she was scheduled to testify against defendant the day after her murder, defendant had been upset for some time over his separation from the victim and the custody of their children, defendant's own testimony reflected his frustration and anger over these issues, and defendant was aware of the ex parte order and that the victim was going to testify. A reasonable jury could conclude that one reason defendant killed his wife was that she obtained the protective order as an aspect of her official duty as a witness against him. N.C.G.S. § 15A-2000(e)(8).

### 32. Sentencing— capital—two aggravating circumstances— same evidence

There was no prejudicial error in a capital sentencing proceeding where the trial court submitted two aggravating circumstances, that the murder was committed to hinder a governmental function and because of the witness's performance of her official duty as a witness, where both of these circumstances referred to the same domestic violence protective order. While there was sufficient evidence to support submission of either circumstance, it was error to submit both; however, there was no prejudice because the jury rejected the circumstance that the murder was committed to disrupt or hinder the lawful exercise of a governmental function. N.C.G.S. § 15A-2000(e)(7); N.C.G.S. § 15A-2000(e)(8).

**33. Sentencing— capital—aggravating circumstance—especially heinous, atrocious or cruel**

The trial court did not err in a capital sentencing proceeding by submitting the especially heinous, atrocious, and cruel aggravating circumstance where the evidence showed that the victim's death was physically agonizing, involved psychological torture, and was conscienceless. There was evidence which included the victim being helpless to prevent her impending death between the time defendant first shot her and when he flipped her over to shoot her a second time, defendant killing the victim in the presence of her parents, and statements by defendant to several witnesses indicating that she feared defendant, as well as the fact that she had taken out a domestic violence order against him.

**34. Sentencing— capital—definition of mitigating circumstances**

The trial court did not err in a capital sentencing proceeding by giving instructions on the definition of mitigating circumstances which were in accord with the pattern jury instructions and which are virtually identical to instructions approved elsewhere. Moreover, the court's additional instructions on mitigating circumstances were also in accord with the pattern jury instructions and were given in cases in which similar arguments were rejected.

**35. Sentencing— capital—mitigating circumstances—nonstatutory circumstances combined**

There was no error in a capital sentencing proceeding where the trial court combined various nonstatutory mitigating circumstances that defendant had requested be submitted separately. The jury was not prevented from considering any potential mitigating evidence; the circumstances proffered by defendant were subsumed in the circumstances submitted by the court; the court's language was identical to defendant's in many instances and, where it was not, the jury was required to address all of the points proposed by defendant; defendant was able to present evidence on each proffered circumstance and to argue the weight of that circumstance to the jury; and the court carefully instructed the jury not to apply a mathematical approach.

**36. Sentencing— capital—nonstatutory mitigating circumstances—father's drinking**

The trial court did not err in a capital sentencing proceeding by not submitting nonstatutory mitigating circumstances dealing

with the effects on defendant of his father's drinking problem where those circumstances either were not supported by the evidence or were subsumed in other mitigating circumstances submitted to the jury.

**37. Sentencing— capital—nonstatutory mitigating circumstance—defendant's potential for rehabilitation—subsumed in other circumstances**

The trial court did not err in a capital sentencing proceeding by not submitting the nonstatutory mitigating circumstance that defendant's prospect for rehabilitation is excellent where that circumstance was subsumed in two of the circumstances submitted.

**38. Sentencing— capital—mitigating circumstances—instructions**

The trial court did not commit reversible error in light of *McKoy v. North Carolina*, 494 U.S. 433, when it instructed the jury that it must be unanimous in its answers to Issues Three and Four on the Issues and Recommendation as to Punishment form.

**39. Sentencing— capital—mitigating circumstance—impaired capacity—consideration by jury**

The jury in a capital sentencing proceeding did not fail to consider the impaired capacity mitigating circumstance where no juror found it to exist. Although defendant contended that the jury must have failed to consider it because the testimony of his psychiatrist was uncontested, the evidence was in fact contested by lay testimony and defendant did not request a peremptory instruction. Moreover, the jury could have considered that the defense expert interviewed defendant for little more than an hour on one occasion. Finally, the statutory circumstances found by the jury indicate that they considered the evidence with discrimination and not arbitrarily. N.C.G.S. § 15A-2000(f)(6).

**40. Sentencing— capital—nonstatutory mitigating circumstances—submitted with peremptory instruction—not found**

There was no error in a capital sentencing proceeding where the jury did not find three of the nine nonstatutory mitigating circumstances submitted with peremptory instructions. A reasonable juror could have concluded that these mitigating circumstances had no mitigating value; the fact that the jury found six

out of the nine submitted indicates that it considered the evidence and the circumstances submitted.

**41. Sentencing— death sentence—not disproportionate**

A sentence of death was not disproportionate where defendant shot his wife while her family watched; inflicted a second wound while the victim begged for her life; reloaded and shot the victim's father and attempted to shoot her mother; there was abundant evidence that he had been considering the shootings for a long time; defendant is an adult and there is no indication that he suffers from diminished capacity; and the especially heinous, atrocious, or cruel aggravating circumstance has been sufficient to support the death penalty even standing alone.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Seay, J., on 3 June 1999 in Superior Court, Gaston County, upon a jury verdict finding defendant guilty of first-degree murder. On 3 August 2000, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of an additional judgment. Heard in the Supreme Court 12 March 2001.

*Roy Cooper, Attorney General, by Robert C. Montgomery, Assistant Attorney General, for the State.*

*Sue A. Berry for defendant-appellant.*

EDMUNDS, Justice.

On 7 July 1997, defendant William Todd Anthony was indicted for first-degree murder of Semantha Belk Anthony[1] and for assault with a deadly weapon with intent to kill inflicting serious injury on John Edward Belk. Defendant was tried capitally before a jury at the 3 May 1999 Criminal Session of Superior Court, Gaston County. On 27 May 1999, the jury found defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation, but not on the basis of felony murder. The jury also returned a verdict of guilty of assault with a deadly weapon with intent to kill inflicting serious injury. Following a capital sentencing proceeding, the jury recommended a sentence of death for the murder. On 3 June 1999, the trial court sentenced defendant to death for the first-degree murder conviction and

---

1. Although the victim's name is incorrectly spelled "Samantha" in the indictment, the prosecutor advised the trial court that the correct spelling is "Semantha." In testimony, witnesses frequently referred to her as "Sandy."

seventy-three to ninety-seven months' imprisonment for the assault conviction. Defendant appeals his conviction for first-degree murder and his sentence of death to this Court as a matter of right. On 3 August 2000, we allowed defendant's motion to bypass the Court of Appeals as to his appeal of the assault conviction. For the reasons that follow, we conclude that defendant's trial and capital sentencing proceeding were free from prejudicial error and that defendant's sentence of death is not disproportionate.

At defendant's trial, the State presented evidence that defendant and Semantha Belk Anthony were married on 26 October 1985 and that two children were born of the marriage. Defendant and Semantha separated for several months in 1992. During this separation, defendant wrecked Semantha's vehicle with his truck and grabbed her after allegedly seeing her with another man. Defendant was charged with communicating a threat and with assault on a female as a result of this incident, but the charges were subsequently dropped. Defendant and Semantha temporarily reconciled but separated again in March 1997, as detailed below. Semantha told her mother, Martha Belk, that she was leaving defendant because her sons "were being abused" and "she was scared of [defendant]." Similarly, she told her father, John Edward Belk, that she was separating from defendant because "she was afraid he was going to kill her and the boys."

On 15 March 1997, Semantha met with attorney Jay Stroud, who prepared a separation agreement. This agreement, which defendant and Semantha signed on 19 March 1997, gave Semantha primary custody of the children and entitled defendant, in part, to visitation with the children twice a week and on alternate weekends. Thereafter, Semantha and the children left the marital residence. Semantha stayed with her parents briefly, then moved into an apartment. The children slept at the Belks' home.

A week after signing the separation agreement, defendant contacted Susan Russell, a legal assistant for attorney Stroud, to complain about Semantha's failure to remove the remainder of her property from the marital residence. Ms. Russell contacted Semantha, who responded that defendant had been harassing her since they signed the separation agreement. She further explained that she had not yet acted because she was afraid of defendant and was trying to find someone to accompany her when she retrieved her property. In fact, on 16 March 1997, the day after Semantha visited

attorney Stroud, the Gaston County Police Department had been dispatched to the marital residence in response to a domestic dispute. Defendant told the responding officer that he had a gun but had thrown it in the woods behind the house at Semantha's request.

On 9 April 1997, Semantha filed a "Complaint and Motion for a Domestic Violence Protective Order" against defendant in which she stated, "4-8-97. Has threatened to kill me, constantly follows me at different times, carries a gun. I fear for my life." That same day, a judge signed an "Ex Parte Domestic Violence Protective Order" and set a hearing in the matter for 16 April 1997.

On the morning of Tuesday, 15 April 1997, defendant arrived at the Belks' home to visit his children. Although in the past defendant had been welcome do to so whenever he wanted, Semantha instructed her parents no longer to allow defendant to see the children before school because his visits upset them. However, when Mr. Belk told defendant that he could not see his children, defendant pushed him aside and entered the house. Defendant was crying at the time, and his children became agitated while talking to him. After defendant left, Mr. Belk reported the incident to the police, and J.T. Welch, an officer with the Mount Holly Police Department, responded. He testified that Mr. Belk described the incident to him and stated that defendant had at some point made threats that he would kill the whole family. Mr. Belk appeared troubled and said that he did not know what defendant was capable of doing. He added that he thought his daughter had obtained a restraining order against defendant.

Officer Welch advised Scott Wright, an officer with the Mount Holly Police Department, of the incident and of a possible restraining order against defendant. Officer Wright went to the Belks' home to speak with Semantha, who told him about the incident that morning and added that defendant had been following her and threatening to "blow her f——ing head off." After speaking with Semantha, Officer Wright confirmed that an "Ex Parte Domestic Violence Protection Order" had been issued.

Officer Wright saw Semantha later that day at a hair salon. While speaking with her, she exclaimed, "There he is, there he is," and she and the officer watched as defendant drove slowly past the salon. Afterwards, Officer Wright visited Semantha at her residence, where she told him that defendant was supposed to bring the children to her parents' home later that day. She requested that a police officer come

by during that time because she thought there would be trouble and added, "He'll kill me if he gets a chance."

That same day, Semantha also called legal assistant Russell to report that defendant had hired an attorney who was going to attempt to have the 16 April 1997 domestic violence hearing postponed because defendant was scheduled to undergo surgery. During their conversation, Semantha told Ms. Russell that she recently had purchased a gun because she was afraid to stay in her residence without protection and that her children were sleeping at her parents' home because she was fearful something would happen.

Defendant went back to the Belks' home on the afternoon of 15 April 1997, bringing flowers for Semantha and steaks for the Belks as an apology for the encounter that morning. Although defendant left after several minutes, events rapidly took an ominous turn. Defendant's stepfather, Johnny Kendall, testified that he later told Mount Holly Police Officer Barry Colvard that he thought he had talked defendant out of doing something he would regret but that when defendant grabbed several shotgun shells and ran out of the house, Mr. Kendall called 911. He told the operator that defendant had left his home with a gun to shoot Semantha. Randy Carter, a neighbor of the Kendalls, testified that Mrs. Kendall came to his house on 15 April 1997 just prior to the shootings and asked him to calm defendant. Defendant told Mr. Carter that he could not take it anymore and was going to kill Semantha. While Mr. Carter was speaking with defendant, defendant was searching for something in three rooms and the attic of the Kendalls' house. When defendant left, Mr. Carter observed a shotgun in the back of defendant's truck.

Approximately one hour after leaving the Belks' home, defendant returned. Semantha, who was there waiting for defendant to drop off the children, ran outside when she heard defendant blow his horn. Mr. Belk, who had seen defendant drive down the street, was outside talking with his neighbor James Fitcher. Several minutes later, Mr. Belk heard someone yell, "Todd's got Sandy, dragging Sandy out front, he's got a gun." Mr. Belk ran inside his home to find something with which to defend himself. When he emerged, he saw that defendant was wielding a shotgun while holding the crouching or kneeling Semantha by her hair. Defendant told Semantha, "Hold still, b——. I'm going to kill you," while she pleaded with defendant to let her go. When Mr. Belk told defendant not to hurt his daughter, defendant became distracted and Semantha was able to break free and run.

STATE v. ANTHONY

[354 N.C. 372 (2001)]

Defendant chased her and shot her in the back. He then reloaded his shotgun and, as the wounded Semantha lay on the ground begging for her life, flipped her over with his foot; said, "Hold still, b———"; and shot her again. Defendant reloaded; aimed his shotgun at Mr. Belk; said, "You're next, old man"; and shot Mr. Belk in the shoulder. Defendant next aimed at Mrs. Belk, who was standing on her front porch. Although defendant apparently pulled the trigger, his weapon failed to fire. Defendant threw the shotgun in the back of his truck; said, "Now I can go to jail"; then sped away, scattering gravel. Several neighbors, including James Fitcher, Kimberly Fitcher, Brenda Cagle, Bobbie Auten, and Gloria Jenkins, witnessed the shootings and corroborated the testimony of Mr. and Mrs. Belk.

After shooting Semantha and Mr. Belk, defendant drove to his parents' house. Defendant told Mr. Carter that he had shot Semantha and asked Mr. Carter to drive him to the jail. As Mr. Carter was driving, defendant repeatedly stated, "Why did she do this to me? Why? Why? Why?" Mr. Carter saw several patrol vehicles and flagged down Mount Holly Police Officer B.G. Summey. As Officer Summey approached, defendant spontaneously stated, "I did it. I shot them. I couldn't take it anymore." Defendant identified himself and while being handcuffed said, "I shot her twice. Is she all right?" After advising defendant of his *Miranda* rights, Officer Summey searched defendant and found several Xanax tablets in defendant's pocket. Defendant then told Officer Summey that the murder weapon was in the back of his truck at his parents' home.

Defendant was taken to the Mount Holly Police Department, where he consented to a search of his truck and his parents' home. When asked to sign a waiver of rights form, defendant responded, "Yes, I'm guilty. I'll sign whatever." Defendant said that he had not slept in three to four weeks and that he had taken several Xanax pills before the shootings. When Officer Summey informed defendant that his wife had died and that he was under arrest for her murder, defendant responded, "I know I'm guilty." Thereafter, defendant was transported to the Gaston County Police Department to be fingerprinted and photographed. While entering the patrol vehicle, defendant responded to an officer's caution to watch his head by saying, "I just killed my wife. My head's the last of my worries." While en route, defendant asked, "Is she still alive?" and "Can I get the death penalty for this?"

Once at the Gaston County Police Department, defendant explained that he killed his wife because she was seeing other men

and was not going to let him visit his children. He stated that Semantha had called his mother that day and told her she was never going to let defendant see his children again, she wished defendant was dead, and she would not even visit defendant's grave if he died. Defendant was then taken to the magistrate's office. On the way, defendant commented, "One of the bullets was meant for me, and the old man confronted me so I shot him too," and "I pulled the trigger. I'm guilty. Go ahead and give me the death penalty." Defendant told the magistrate, "I didn't mean to do it but she kept using the kids against me."

Several witnesses testified as to statements defendant made prior to the murder indicating his intention to kill his wife. Benny Hale, owner of Benny's Fishing Lake, testified that defendant was a frequent customer. He noticed a change in defendant in February 1997. Approximately two weeks before Semantha's murder, defendant told Mr. Hale that he was experiencing problems with his wife because she would not let him see his children as often as he wanted. During this conversation, defendant became upset; began to cry; and stated to Mr. Hale, "Benny, I'm thinking about killing the b——." On 10 April 1997, defendant told Kimberly Fitcher, the Belks' neighbor, that Semantha had served papers at his place of employment and was opposing his efforts to obtain joint custody of their children. Ms. Fitcher testified that defendant said "he would hurt anyone who stood in his way of him being with his kids." Gordon Arnold, manager of Mount Holly Farm Supply, testified that defendant entered his store on 14 April 1997. When Mr. Arnold asked defendant, "Can I help you?" defendant, who was visibly upset, responded, "You can't help me with my problems. . . . My wife left me. She is running around on me. She won't let me see my kids. I am going to kill her and if her old man gets in my way, I'm going to kill him, too." Finally, Carl Barker, who had been defendant's supervisor at work for approximately ten years, testified that defendant had not been himself for six months prior to Semantha's murder. On several occasions, including 15 April 1997, defendant told him that "he was going to kill the b——."

Dr. Peter Wittenberg, the pathologist at Gaston Memorial Hospital who autopsied Semantha, testified that her death was caused by bleeding from the lungs and wounds in her chest. He described her death as not immediate and "very painful." Dr. Timothy Carr, an emergency physician at Gaston Memorial Hospital, treated Mr. Belk on 15 April 1997 and described his injuries as life-threatening. Ronald Marrs, a special agent with the North Carolina State

Bureau of Investigation, was accepted as an expert in firearms and tool-mark examinations and identifications. He identified the twenty-gauge shotgun retrieved from defendant's truck as the weapon used in the shootings and determined from examination of Semantha's clothing that defendant was twelve to twenty-one feet away from her when he fired the first shot and six to twelve feet away from her when he fired the second shot.

Defendant presented evidence at the guilt-innocence phase of his trial to establish a history of tension in his relationship with Semantha. He testified that various individuals told him that she was having affairs and that he had seen her kiss another man during their first separation. He claimed that after their March 1997 separation Semantha attempted to prevent him from seeing his children.

On the day of the shootings, defendant was upset about his separation from Semantha and his inability to see his children. He consumed beer, vodka, and Xanax to deal with this distress, and as a result could not remember what happened at the Belks' home and thereafter. Numerous witnesses corroborated defendant's claim to have consumed intoxicants, including defendant's father, Tony Anthony; his mother, Diane Kendall; and his stepfather, Johnny Kendall. Vivian Daley, a nurse at the Gaston County jail, testified that when she saw defendant on 16 April 1997, less than twenty-four hours after the shootings, he "was staring straight ahead and he was crying. . . . [I]n my professional opinion, he did not seem to know where he was." She noted that defendant's eyes were dilated and that he smelled of alcohol. Terry Wellman, a nurse at the Gaston County Police Department, observed defendant on 16 April 1997 shortly after his apparent attempt to commit suicide in jail. Because defendant was crying incoherently and his eyes were dilated, she requested a drug test. The results were positive for Xanax even though the test was administered twenty hours after the murder.

Dr. Roy J. Mathew, who was tendered and accepted as an expert in psychiatry specializing in the fields of addiction medicine and addiction psychiatry, testified as to the effects of Xanax and alcohol on the human brain. Dr. Mathew was of the opinion that defendant's claimed memory loss of the murder was valid, and characterized what happened to defendant as a "black-out." He also believed that defendant's suicide attempt in the Gaston County jail was consistent with ingestion of Xanax. As to defendant's mental condition on the day of the murder, Dr. Mathew stated, "I think he was significantly impaired. He was significantly intoxicated at the time of the alleged

crime with alcohol and Xanax. It's very difficult to separate one from the other because, as I indicated earlier, they do more or less the same thing in the brain." When asked whether defendant's mind and reason were so completely intoxicated and impaired that he could not form a specific intent to kill, Dr. Mathew responded, "I feel that he was significantly intoxicated by Xanax, alcohol, and both; that it would have been difficult for him to think rationally and clearly."

Additional evidence was presented during the capital sentencing proceeding. This evidence will be discussed below as necessary to address sentencing issues.

**[1]** We note at the outset that defendant has presented ninety-seven assignments of error. For convenience, clarity, and continuity, we have grouped related assignments of error in our opinion. We also note that, while defendant includes a constitutional component to almost all his assignments of error, in most instances he failed to preserve the constitutional issues at trial and has provided no argument and cited no cases in support of his constitutional arguments here. "Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal," *State v. Lloyd*, 354 N.C. 76, 86-87, 552 S.E.2d 596, 607 (2001), and assignments of error in support of which no argument or authority is stated will be taken as abandoned, *id.* (quoting N.C. R. App. P. 28(b)(5)). Accordingly, we will consider only his properly preserved arguments.

## PRETRIAL ISSUES

**[2]** Defendant first contends that the trial court erred in denying his motion to compel the State to disclose whether it intended to offer evidence pursuant to Rules 803(24), 804(b)(5), and 404(b) of the North Carolina Rules of Evidence. Defendant filed his motion to compel on 2 February 1998, asserting that: (1) Rule 404(b) evidence "is rarely found in pre-trial discovery," and he "will likely not have the chance to meet any such evidence at trial without prior notice"; and (2) he "is entitled to try to avoid 'trial by ambush' with respect to the evidence admissible under" Rules 803(24) and 804(b)(5). On 5 February 1998, the trial court orally denied defendant's motion, stating:

The Court in its discretion on [defendant's] motion to compel [the] State to disclose whether it intends to offer evidence under Rules 803[(24)], 804(b)(5) and 404(b) of the North Carolina Rules of Evidence, the Court in its discretion will deny this motion. The

STATE v. ANTHONY

[354 N.C. 372 (2001)]

Court further notes that both Rules 803[(24)] and 804(b)(5) have separate provisions which require the State to provide notice in advance. Therefore, that is dealt with in the rule itself. The Court therefore in its discretion will deny that motion.

Thereafter, on 5 May 1999, the State filed notice of its intention to offer hearsay pursuant to Rules 803(24) and 804(b)(5), including statements made by Semantha before her death to Officer B.S. Wright and Susan Russell, as well as to the Gaston County Clerk of Superior Court's office in statements contained in Semantha's "Complaint and Motion for Domestic Violence Protective Order."

Rules 803 and 804 of the North Carolina Rules of Evidence provide for the admissibility of hearsay statements. Rule 803 addresses situations where the availability of the declarant is immaterial, while Rule 804 deals with situations where the declarant is unavailable. Each rule contains the following identical provision:

> However, a statement may not be admitted under this exception unless the proponent of it gives written notice stating his intention to offer the statement and the particulars of it, including the name and address of the declarant, to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to prepare to meet the statement.

N.C.G.S. § 8C-1, Rules 803(24), 804(b)(5) (1999). Because notice requirements are contained in the rules themselves, an order compelling such disclosure would be redundant. Therefore, we hold the trial court did not abuse its discretion in denying defendant's motion to compel early disclosure of hearsay statements under Rules 803(24) and 804(b)(5).

Defendant argues that the State, by disclosing the hearsay statements only after jury selection began, "was allowed to sand-bag" defendant with the result that "[t]he spirit, along with the letter of the rule, is lost." Defendant did not raise this issue at trial or as an assignment of error, thereby precluding review. N.C. R. App. P. 10(a), (b)(1). Nonetheless, we observe that the State complied with the requirements of the rules by providing the particulars of the hearsay statements in its notice to defendant and by disclosing the statements five days before opening arguments and testimony began. Defendant did not make a motion to continue based on any untimeliness of the State's notice, nor did he assert that he was surprised by the state-

ments. *See State v. Garner*, 330 N.C. 273, 283, 410 S.E.2d 861, 866 (1991).

As to defendant's arguments pertaining to Rule 404 of the North Carolina Rules of Evidence, that rule provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (1999). We find no support for defendant's assertions that disclosure of Rule 404(b) evidence is required by North Carolina law, nor does defendant refer to any. To the contrary, we have previously held that Rule 404(b) " 'addresses the admissibility of evidence; it is not a discovery statute which requires the State to disclose such evidence as it might introduce thereunder.' " *State v. Ocasio*, 344 N.C. 568, 576, 476 S.E.2d 281, 285 (1996) (quoting *State v. Payne*, 337 N.C. 505, 516, 448 S.E.2d 93, 99 (1994), *cert. denied*, 514 U.S. 1038, 131 L. Ed. 2d 292 (1995)). Accordingly, the trial court did not err in denying defendant's motion to compel disclosure of evidence offered pursuant to Rules 803(24), 804(b)(5), and 404(b). This assignment of error is overruled.

[3] Defendant next contends that the trial court erred in denying his motion to recuse the district attorney's office from prosecuting his case. Defendant filed his recusal motion on 18 March 1999, asserting that the Gaston County District Attorney's Office had a conflict in prosecuting his case because two of defendant's former attorneys at the Gaston County Public Defender's Office had joined the Gaston County District Attorney's Office by the time of trial. The trial court conducted a hearing on defendant's motion and considered the testimony of John Greenlee and James Jackson, the attorneys in question. Attorney Greenlee stated that he was assigned to represent defendant along with Public Defender Kellum Morris prior to joining the district attorney's office. However, he testified that he did not obtain any confidential information as a result of his representation of defendant:

> Q: Mr. Greenlee, since you—do you recall what involvement you had as Mr. Anthony's attorney?
>
> A: All I remember is that after the Rule 24 Hearing, which I was not present for, Mr. Morris told me I was assigned second chair. I

believe I requested that a copy of the file be provided to me at some point. I don't recall if one was ever provided to me, I assume it was, but I never read it. Never met Mr. Anthony, never spoke with Mr. Anthony, and didn't gain any knowledge or do any investigations into the case.

. . . .

Q: Have we—have I ever asked you any of the facts of the case or anything you may have learned in regards to defending Mr. Anthony?

A: No.

Q: Have you talked with any member of the District Attorney's Office about anything that you ever learned as—in your defense of Mr. Anthony?

A: No.

Attorney Jackson testified that he was also assigned to represent defendant along with Public Defender Kellum Morris prior to joining the district attorney's office. As with attorney Greenlee, however, he did not gain any confidential information as a result of his representation of defendant:

Q: Mr. Jackson, after you were told that you would be becoming involved with the Anthony case to you making the decision to come to the District Attorney's Office was how long a period of time?

A: I would say that would have been anywhere from a week to two weeks because shortly—it was very, very briefly after Mr. Greenlee made that decision that I made mine. I would have said no more—no more than two weeks.

Q: Did you ever talk with Mr. Anthony?

A: I've never spoken with Mr. Anthony.

Q: And you said that you may have had access to the file but, to your knowledge, did you ever read the file?

A: I do not—I can't recall ever reading the file or looking at the file. I don't know any specifics about this particular situation. I know the general allegations.

. . . .

Q: Have you ever talked with me about any aspect of the Anthony case?

A: I have never spoken with you or anyone else.

Q: Ever talked with anyone who is involved in the actual trial of Mr. Anthony?

A: Never. I haven't . . . spoken to any witnesses; I haven't spoken to Mr. Anthony; I haven't taken any phone calls regarding Mr. Anthony; nothing.

After the hearing, the trial court entered an order in which it set out the following pertinent findings of fact:

13. That during the time Mr. Greenlee and Mr. Jackson were appointed to represent the Defendant, they did not meet the Defendant, talk with the Defendant, or appear in court on behalf of the Defendant.

14. That neither Mr. Greenlee nor Mr. Jackson recalled seeing the Defendant's case file while at the Public Defender's Office.

15. That neither Mr. Greenlee nor Mr. Jackson obtained confidential information about the Defendant while in the Public Defender's Office which could be used to the Defendant's detriment in the trial of this matter.

The trial court concluded that an actual conflict of interest did not exist and denied defendant's motion. On appeal, defendant does not challenge the trial court's findings of fact, nor does he maintain that an actual conflict of interest exists. Rather, he argues that the trial court should have granted his motion to "avoid the appearances of impropriety."

This issue is controlled by our holding in *State v. Camacho*, 329 N.C. 589, 406 S.E.2d 868 (1991). In that case, an attorney who had been employed as an assistant public defender with the Mecklenburg County Public Defender's Office, which was representing the defendant on murder and robbery charges, left to become an assistant district attorney with the Mecklenburg County District Attorney's Office, which was prosecuting the defendant. The defendant filed a motion to recuse the entire District Attorney's Office from prosecuting his case. At a subsequent hearing, the attorney in question testified that although she had assisted other attorneys in preparing a motion for

the defendant alleging ineffective assistance of counsel, she had not been assigned to the defendant's case while in the public defender's office. During that time, she had not been involved in any substantive aspect of the case, nor had she seen any of the files concerning the defendant. Although she recalled some discussion regarding the defendant's case while at the public defender's office, she could not remember the details of the conversation and had not revealed any information about the defendant's case to anyone at the district attorney's office. The trial court granted the defendant's motion.

We reversed, holding that

> a prosecutor may not be disqualified from prosecuting a criminal action in this State unless and until the trial court determines that an actual conflict of interests exists. In this context, an "actual conflict of interest[]" is demonstrated where a District Attorney or a member of his or her staff has previously represented the defendant with regard to the charges to be prosecuted and, as a result of that former attorney-client relationship, the prosecution has obtained confidential information which may be used to the defendant's detriment at trial. Even then, however, any order of disqualification ordinarily should be directed only to individual prosecutors who have been exposed to such information.

*Id.* at 601, 406 S.E.2d at 875. If a trial court finds an actual conflict of interest to exist, "the trial court may disqualify the prosecutor having the conflict from participating in the prosecution of a defendant's case and order that prosecutor not to reveal information which might be harmful to the defendant." *Id.* at 602, 406 S.E.2d at 876; *see also State v. Reid*, 334 N.C. 551, 561, 434 S.E.2d 193, 200 (1993).

In the case at bar, the two attorneys were initially assigned to be co-counsel for defendant but resigned prior to obtaining any confidential information about the case. Neither discussed the case with other prosecutors at their new employment. The attorneys acted properly in avoiding all contact with the case after changing jobs, and defendant has failed to show the actual conflict of interest required by *State v. Camacho.*

Defendant also asserted in his recusal motion and in this assignment of error that the personal relationship that arose between the elected district attorney and the father of the deceased should have barred the district attorney's office from prosecuting the case. Because defendant did not set out any argument or authority for this

position in his appellate brief, we deem this issue abandoned. N.C. R. App. P. 28(b)(5). This assignment of error is overruled.

**[4]** Defendant next contends that the trial court erred in denying his motion for instructions to explain the capital sentencing process to prospective jurors. Defendant filed a pretrial motion on 2 February 1998, requesting the trial court to inform prospective jurors of the process of finding, evaluating, and weighing the evidence of aggravating and mitigating circumstances. On 3 May 1999, the trial court orally denied defendant's motion, stating that it intended to follow the statutory provisions and the North Carolina pattern jury instructions. Although the trial court gave defendant an opportunity to object, he declined. The trial court then instructed the jury in accord with criminal instruction 106.10. N.C.P.I.—Crim. 106.10 (1994).

A trial court has broad discretion to see that a competent, fair, and impartial jury is impaneled, and its rulings concerning jury selection will be reversed only upon a showing of abuse of discretion. *State v. Meyer*, 353 N.C. 92, 104, 540 S.E.2d 1, 8 (2000), *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 54 (2001). We previously have addressed the issue raised by defendant, noting:

> "We find no abuse of discretion by the trial court in refusing to give the defendant's requested preliminary instruction. By utilizing the pattern instruction, a trial court accurately and sufficiently explains the bifurcated nature of a capital trial, avoids potential prejudice to the defendant, and helps to insure the uniformity of jury instructions for all trials."

*State v. Steen*, 352 N.C. 227, 250, 536 S.E.2d 1, 15 (2000) (quoting *State v. Jones*, 339 N.C. 114, 143, 451 S.E.2d 826, 841 (1994), *cert. denied*, 515 U.S. 1169, 132 L. Ed. 2d 873 (1995)), *cert. denied*, 531 U.S. 1167, 148 L. Ed. 2d 997 (2001).

In this case, the trial court correctly instructed the prospective jurors as to the law governing the capital sentencing process. Because the trial court's instructions were in accord with the pattern jury instructions that have been approved previously by this Court, *see, e.g., State v. Artis*, 325 N.C. 278, 295, 384 S.E.2d 470, 479 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), we do not agree with defendant's assertion that the trial court failed to provide the jury with an understandable explanation of the law governing capital sentencing. This assignment of error is overruled.

**[5]** Defendant also contends that the trial court erred in denying his "Motion for Sequestration and Segregation of State's Witnesses During Trial." On 2 February 1998, defendant filed the motion, requesting sequestration of the State's witnesses for three reasons: (1) to prevent the witnesses from altering their testimony or previous statements to conform to that of other witnesses; (2) to prevent an unduly persuasive effect upon the minds of jurors as a result of the extensive number of witnesses by the State, particularly law enforcement officers; and (3) to prevent loss of individual recollection of the witnesses in favor of a "consensus recollection" resulting from the gathering of the State's witnesses during a lengthy trial. On 3 May 1999, the trial court denied defendant's motion.

The statute regarding sequestration of witnesses at trial provides in pertinent part: "Upon motion of a party the judge may order all or some of the witnesses other than the defendant to remain outside of the courtroom until called to testify." N.C.G.S. § 15A-1225 (1999); *see also* N.C.G.S. § 8C-1, Rule 615 (1999). Because the North Carolina rule is permissive, a ruling on a motion to sequester witnesses pursuant to this statute " 'rests within the sound discretion of the trial court, and the court's denial of the motion will not be disturbed in the absence of a showing that the ruling was so arbitrary that it could not have been the result of a reasoned decision.' " *State v. Hyde*, 352 N.C. 37, 43, 530 S.E.2d 281, 286 (2000) (quoting *State v. Call*, 349 N.C. 382, 400, 508 S.E.2d 496, 507-08 (1998)), *cert. denied*, 531 U.S. 1114, 148 L. Ed. 2d 775 (2001).

In his motion to sequester, defendant gave no specific reason to suspect that the State's witnesses would tailor their testimony to fit within a general consensus. Defendant has not pointed to any instance in the record where a witness conformed his or her testimony to that of another witness, and he argues on appeal only that the trial court was biased against him in denying his motion even though facilities were available to accommodate sequestered witnesses. We see no abuse of discretion in the trial court's ruling.

Nevertheless, we observe that the commentary to N.C.G.S. § 8C-1, Rule 615 provides: "[T]he [better] practice should be to sequester witnesses on request of either party unless some reason exists not to." Particularly in cases as consequential as a capital murder trial, judges should give such motions thoughtful consideration. *See State v. Wilds*, 133 N.C. App. 195, 210, 515 S.E.2d 466, 477-78 (1999) (Edmunds, J., concurring). This assignment of error is overruled.

STATE v. ANTHONY

[354 N.C. 372 (2001)]

## JURY SELECTION

**[6]** In his only assignment of error relating to jury selection, defendant contends that the trial court erred in denying his requests to rehabilitate seven prospective jurors, Deborah Mull, John White, Frankie Davis, Daria Ragan, Brenda Fortenberry, Allen McDuffie, and Robert Hill, who were challenged for cause on the basis of their views of the death penalty. A juror properly may be excused for cause in a capital case if his or her views regarding the death penalty would " 'prevent or substantially impair the performance of his [or her] duties as a juror in accordance with his [or her] instructions and his [or her] oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)). However,

> "[a] defendant is not allowed to rehabilitate a juror who has expressed unequivocal opposition to the death penalty in response to questions propounded by the prosecutor and the trial court. The reasoning behind this rule is clear. It prevents harassment of the prospective jurors based on their personal views toward the death penalty."

*State v. Fleming*, 350 N.C. 109, 124, 512 S.E.2d 720, 731 (quoting *State v. Cummings*, 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990)), *cert. denied*, 528 U.S. 941, 145 L. Ed. 2d 274 (1999); *see also State v. Warren*, 347 N.C. 309, 326, 492 S.E.2d 609, 618 (1997) ("A defendant has no absolute right to question or to rehabilitate prospective jurors before or after the trial court excuses such jurors for cause."), *cert. denied*, 523 U.S. 1109, 140 L. Ed. 2d 818 (1998). "The decision whether to allow a defendant an opportunity to rehabilitate a prospective juror challenged for cause rests within the sound discretion of the trial court." *State v. Call*, 349 N.C. at 401, 508 S.E.2d at 508. "The trial court does not abuse its discretion by refusing to allow a defendant an attempt to rehabilitate a juror unless the defendant can show that further questions would have produced different answers by the juror." *State v. Blakeney*, 352 N.C. 287, 301, 531 S.E.2d 799, 811 (2000), *cert. denied*, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001). We consider the *voir dire* of each juror in light of these general principles.

### Prospective Jurors Mull, White, and Davis

Prospective jurors Mull, White, and Davis were considered together. When questioned by the State, Ms. Mull and Mr. White

immediately announced that their views on the death penalty would prevent them from being able to consider a capital sentence. Although Ms. Davis also stated initially that "I don't know—well, I'm against the death penalty," her subsequent answers under further questioning were somewhat equivocal. Nevertheless, she later indicated that "saying he deserves death, I—I just don't believe in that," and that her views would substantially impair her performance as a juror. When the trial court asked each of these jurors clarifying questions to confirm their opposition to the death penalty, each was resolute in his or her refusal to consider the death penalty under any circumstances.

### Prospective Juror Ragan

Prospective juror Ragan initially stated that she had "mixed feelings" about and was "troubled by" the death penalty. When asked if she could consider a sentence of death if the jury found defendant guilty, she said, "I could consider [the death penalty], but I would have a hard time—well, I would weigh both sides of it, but I think I would have a very hard time actually saying yes to the death penalty." She later added, "I have a hard time imagining something that I would think so awful that I would go with the death penalty." The trial court asked Mrs. Ragan several clarifying questions, to which she responded in part,

> [t]he whole issue of the death penalty has troubled me for a long time, and it's not something I have absolutely formed an opinion about even before I ever walked into this courtroom today. It has always been something that I thought should only be imposed under extreme circumstances. . . . I have a very difficult time coming up with aggravating circumstances so great that I would feel that the death penalty would need to be imposed.

The trial court then denied the State's challenge for cause, stating, "I don't really know or understand what her position is on what." Thereupon, the prosecutor asked several additional questions of juror Ragan:

> [PROSECUTOR]: Have you already formed an opinion as to what—
>
> MRS. RAGAN: Yes, I've already formed an opinion. Yes.
>
> [PROSECUTOR]: If he was found guilty of first-degree murder?

MRS. RAGAN: Yes. I would want to go with life in prison, I'm afraid.

The trial court then allowed the State's challenge for cause.

### Prospective Juror Fortenberry

Prospective juror Fortenberry expressed reservations about imposing the death penalty and was challenged for cause by the prosecutor. Before ruling on the challenge, the trial court asked additional questions. That series of questions ended with the following exchange:

THE COURT: . . . [I]s it that your feelings and your beliefs toward the death penalty would prevent you from doing that?

MRS. FORTENBERRY: My beliefs as a Christian would have—I would have a hard time with it. No, sir, I will not—I would not go with the death penalty.

THE COURT: You just plain flat would not?

MRS. FORTENBERRY: I don't—no.

THE COURT: Not equivocal about it at all?

MRS. FORTENBERRY: No, sir.

The trial court then allowed the motion to excuse Mrs. Fortenberry for cause.

### Prospective Juror McDuffie

During the State's preliminary questioning of prospective juror McDuffie, he stated, "I don't believe in the death penalty." In response to that answer, the following colloquy took place:

[PROSECUTOR]: . . . Are you saying that you would automatically vote against the death penalty no matter what evidence was presented?

MR. McDUFFIE: Well, yeah, basically.

[PROSECUTOR]: That you would automatically vote for life imprisonment no matter what evidence was presented?

MR. McDUFFIE: Yes.

**STATE v. ANTHONY**

[354 N.C. 372 (2001)]

After some additional questioning, the prosecutor challenged Mr. McDuffie for cause. Before ruling on the motion, the court conducted its own inquiry:

THE COURT: Your position is somewhat difficult for me to understand. Is it that your feeling or your belief or what-have-you is such that you would be unable to consider the evidence, apply to that evidence the law of the Court, and make—under any circumstances make a recommendation that the punishment be death?

MR. McDUFFIE: No. I don't think I could sentence anybody to death. I really don't.

THE COURT: You know, you said a minute ago you weren't going to be—that it wasn't that way. Your testimony has been somewhat contradictory. Is that right?

MR. McDUFFIE: I don't know. If somebody went out and killed fifty kids, I might slightly consider it, but that would be about the only way. You know, something like that. It would have to be pretty bad. I don't think I could do it though. I really don't.

THE COURT: But then you could then under certain circumstances consider a recommendation of death?

MR. McDUFFIE: Possibly. Very doubtful.

THE COURT: Mister Solicitor, I believe I'm not going to challenge [sic] him for cause. He says he can possibly do it. I don't understand what he's—what your definition of the word possibly is, but you must as a juror in fairness to the defendant and the State follow the law and the evidence.

MR. McDUFFIE: Okay. I can't. I'm sure I couldn't do it. I'm sure I couldn't do it.

THE COURT: You just changed your mind as you sat here. Is that the idea?

MR. McDUFFIE: No, because I don't—I just don't believe in the death penalty. I wouldn't have any problem sentencing to life in prison without parole or whatever, but I just don't believe in the death penalty.

The trial court then allowed the State's challenge for cause.

### Prospective Juror Hill

Finally, when prospective juror Hill was first asked by the prosecutor whether he had an opinion as to whether the sentence should be death or life if the jury found defendant guilty, he responded that he had no such opinion. However, when the prosecutor returned to the sentencing issue in more detail, the following exchange took place:

[PROSECUTOR]: Now, Mr. Hill, do you have any opinions against the death penalty?

MR. HILL: I've never really given it any thought.

[PROSECUTOR]: You never gave it any thought?

MR. HILL: No. Never been put in this position.

[PROSECUTOR]: I understand that. Do you feel you would be able to consider—if Mr. Anthony was found guilty of first-degree murder that you would be able to consider both possible sentences in this case—life imprisonment or death?

MR. HILL: It's kind of hard to say whether a person live [sic] or die. It would be hard for me to say.

[PROSECUTOR]: It would be hard for you to make a decision on the sentencing phase?

MR. HILL: Yes.

[PROSECUTOR]: Would you automatically vote against a sentence of death?

MR. HILL: Yes, I would.

[PROSECUTOR]: You would?

MR. HILL: Yes, I would.

The trial court then allowed the State's challenge for cause.

This record demonstrates that each of these jurors sooner or later unequivocally stated that he or she could not recommend the death penalty under any circumstances. In light of these responses, we hold that the trial court did not abuse its discretion in denying defendant's requests to attempt to rehabilitate these jurors. This assignment of error is overruled.

## GUILT-INNOCENCE PHASE

[7] In his first assignment of error relating to the guilt-innocence phase of his trial, defendant contends that the trial court failed to preside impartially by improperly expressing an opinion, denigrating jurors and defense counsel, and commenting on witnesses and testimony, violating N.C.G.S. §§ 15A-1222 and 15A-1232 and depriving defendant of a fair trial. Although this assignment of error also refers to comments made by the court during jury selection and the sentencing proceeding, the majority of the comments to which defendant refers occurred during the guilt-innocence phase. Accordingly, we address this assignment of error here.

Section 15A-1222 of the North Carolina General Statutes provides that "[t]he judge may not express during any stage of the trial[] any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C.G.S. § 15A-1222 (1999). Similarly, section 15A-1232 of the North Carolina General Statutes requires that "[i]n instructing the jury, the judge shall not express an opinion as to whether or not a fact has been proved and shall not be required to state, summarize or recapitulate the evidence, or to explain the application of the law to the evidence." N.C.G.S. § 15A-1232 (1999). In applying these statutes, we have stated that

> "[i]n evaluating whether a judge's comments cross into the realm of impermissible opinion, a totality of the circumstances test is utilized." *State v. Larrimore*, 340 N.C. 119, 155, 456 S.E.2d 789, 808 (1995). Further, a defendant claiming that he was deprived of a fair trial by the judge's remarks has the burden of showing prejudice in order to receive a new trial.

*State v. Gell*, 351 N.C. 192, 207, 524 S.E.2d 332, 342, *cert. denied*, 531 U.S. 867, 148 L. Ed. 2d 110 (2000).

Defendant cites thirty-nine instances in which he alleges that the trial court made improper expressions of opinion and inappropriate comments. We have reviewed each comment in context and conclude that defendant has failed to establish any impropriety by the trial court. This assignment of error is overruled.

[8] Defendant next argues that the trial court erred in overruling his objections to questions eliciting four statements Semantha Anthony made prior to her murder. Defendant first addresses two statements made by Semantha after she had been shot. The first statement came into evidence through the testimony of Semantha's father, John Belk.

Mr. Belk testified over objection that before defendant shot Semantha a second time, she begged for her life and stated, "Please, Todd, no." The second statement came into evidence through the testimony of James Fitcher, the Belks' neighbor who stayed by Semantha after she had been shot. Mr. Fitcher was asked by the State, "And as you were talking with Sandy she said what to you?" The trial court overruled defendant's objection, and Mr. Fitcher responded that Semantha told him, "Take care of my boys."

Assuming that these statements were hearsay, both fit within the excited utterance exception to the hearsay rule. Although as a general rule hearsay is inadmissible at trial, N.C.G.S. § 8C-1, Rule 802 (1999), an "excited utterance," which is a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," N.C.G.S. § 8C-1, Rule 803(2), is not excluded by the hearsay rule. For a statement to qualify as an excited utterance, the statement must be: " '(1) a sufficiently startling experience suspending reflective thought and (2) a spontaneous reaction, not one resulting from reflection or fabrication.' " *State v. Maness*, 321 N.C. 454, 459, 364 S.E.2d 349, 351 (1988) (quoting *State v. Smith*, 315 N.C. 76, 86, 337 S.E.2d 833, 841 (1985)). Semantha's statement begging for her life and her statement expressing concern for her children after her death were spontaneous reactions made after she had been wounded. Accordingly, these statements fit within the excited utterance exception. *See State v. Gaines*, 345 N.C. 647, 672, 483 S.E.2d 396, 411 (testimony of officers that victim, after being shot, stated, "Tell Hilda that I love her," "Am I going to die?" and "I'm going to die," fit within excited utterance exception to hearsay rule and were admissible at trial), *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997). Moreover, the statements are not so inflammatory as to be unfairly prejudicial pursuant to N.C.G.S. § 8C-1, Rule 403. Accordingly, these statements were admissible at trial.

[9] Defendant next contends that Mrs. Belk's statement that Semantha did not want defendant to see their children before they left for school "[b]ecause they would get upset and be crying every time when they started to go to school" did not fit within any exception to the hearsay rule and was therefore inadmissible. However, this statement was not hearsay. It was offered not to establish that the children became agitated, but to explain why Mr. Belk tried to prevent defendant from seeing the children on the morning of the killing. "[O]ut of court statements offered for purposes other than to

prove the truth of the matter asserted are not considered hearsay." *State v. Thomas*, 350 N.C. 315, 339, 514 S.E.2d 486, 501, *cert. denied*, 528 U.S. 1006, 145 L. Ed. 2d 388 (1999). In addition, we have held that "statements of one person to another to explain subsequent actions taken by the person to whom the statement was made are admissible as nonhearsay evidence." *Id.* Mr. Belk's actions upset defendant and contributed to his motive for the shootings later that day. Accordingly, this testimony was relevant and not unduly prejudicial. The trial court properly admitted the statement.

[10] The remaining statements to which defendant points were admitted through the testimony of Officer Scott Wright, who spoke with Semantha after another officer briefed him about the domestic violence restraining order. The statements in question pertained to the victim's state of mind:

> A: She said that she thought she had a restraining order but she didn't know if it was active, but she had a court date the next day which was April 16th. So I got a description of Mr. Anthony's vehicle and a description of him and I told her I would go by the police department and check on the restraining order and get back with her.
>
> . . . .
>
> A: She told me that he followed her around, threatening her, basically annoyed her a lot.
>
> . . . .
>
> A: She said that he told her he would blow her f——ing head off.
>
> . . . .
>
> A: [As to the restraining order, which was to expire on 16 April 1997,] [s]he said she was going to court the next day and she would get it taken care of then.
>
> . . . .
>
> A: I spoke with her and she stated that Mr. Anthony was supposed to come either to pick up the kids or drop them off at her father's house, and that she would like for a police officer to come stand by when they did that because she felt like there would be trouble.
>
> . . . .

A: She said she had a court date the next day and she would get the restraining order taken care of, get it extended or reinstated, whatever she had to do.

Rule 803 of the North Carolina Rules of Evidence provides, in pertinent part, as follows:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(3) Then Existing Mental, Emotional, or Physical Condition.—A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health).

N.C.G.S. § 8C-1, Rule 803(3). "Evidence tending to show the victim's state of mind is admissible so long as the victim's state of mind is relevant to the case at hand." *State v. Stager*, 329 N.C. 278, 314, 406 S.E.2d 876, 897 (1991). " 'Any evidence offered to shed light upon the crime charged should be admitted by the trial court.' " *Id.* (quoting *State v. Meekins*, 326 N.C. 689, 695-96, 392 S.E.2d 346, 349 (1990)). Also, statements by a victim of her then-existing intent and plan to engage in a future act are admissible. *State v. Taylor*, 332 N.C. 372, 386, 420 S.E.2d 414, 422 (1992). Here, Semantha's statements made on the day of her murder reflected her state of mind and were relevant because they related directly to circumstances giving rise to a feared confrontation with defendant on the day she was murdered. Also, Semantha's statements that she intended to go to court the next day in relation to the domestic violence protective order and restraining order are admissible as her then-existing intent and plan to engage in a future act. These statements also were relevant "to show a relationship between defendant and the victim which was more favorable to the State and contrary to defendant's version of this relationship, which was more favorable to defendant." *State v. Meekins*, 326 N.C. at 696, 392 S.E.2d at 350. In addition, the probative value of this evidence substantially outweighs any potential prejudice to defendant. This assignment of error is overruled.

[11] By his next assignment of error, defendant contends that the trial court erred in overruling his objection and permitting Mrs. Belk on direct examination to respond to the prosecutor's question, "Sandy expected [defendant] to bring the boys back to your house?"

Defendant contends that the question called for speculation and permitted the State to argue that the victim was lured out of the house by defendant when he brought their children to the Belks' house on the day of the murder.

The State argues that the question was permissible to describe Semantha's habit. Rule 406 of the North Carolina General Statutes provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

N.C.G.S. § 8C-1, Rule 406 (1999). Under this rule, the instances of specific conduct must be sufficiently numerous and regular to warrant an inference of systematic conduct and to outweigh the danger, if any, of prejudice and confusion. *State v. Hill*, 331 N.C. 387, 408, 417 S.E.2d 765, 775 (1992) ("Mere evidence of intemperance ordinarily does not meet the 'invariable regularity' standard required of evidence of habit."), *cert. denied*, 507 U.S. 924, 122 L. Ed. 2d 684 (1993). Although we agree with the State that sufficient evidence was presented of defendant's and Semantha's habitual behavior in picking up and dropping off the children to satisfy the requirements of Rule 406, the particular question was objectionable because it improperly invited speculation into Semantha's thoughts rather than a description of her actions. Nevertheless, admission of this statement was harmless error, not a " '*fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done.' " *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.) (footnote omitted), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)). In light of the evidence against defendant, improper admission of the answer to this question did not prejudice defendant. This assignment of error is overruled.

**[12]** By his next assignment of error, defendant contends that the trial court erred by overruling his objections to the testimony of Officer J.T. Welch because the testimony improperly concerned matters that required legal interpretation. On direct examination, Officer Welch testified that he responded to a call from Mr. Belk after defendant pushed past Mr. Belk to see his children on the morning of the murder:

Q: How did you have an occasion to meet Mr. John Belk the morning of April 15, 1997?

A: We had a call to 113 Adcock Street in reference to a subject trespassing.

Q: What did you do, Officer?

A: I responded to the call. When I got there I spoke with Mr. Belk. Mr. Belk advised me that Todd Anthony had been there but he had left. His daughter had a restraining order against Mr. Anthony. He told me that Mr. Anthony was there because he wanted to see his kids. . . .

. . . .

A: . . . I told him since Todd Anthony did violate a restraining order that we would be looking for him the rest of the day to try to arrest him for violation of a restraining order and I also notified the officer that rode that area, which was officer Wright, about the incident.

Q: Why would Mr. Anthony's presence at Mr. Belk's house be a violation of the restraining order?

. . . .

A: Okay. It is a 50(b) order, the State of North Carolina. If you take this out on a person they have certain restrictions. They can't be anywhere near where the—you know, where the person that has the restraining order against them. They can't be anywhere near them. They can't contact them by phone or anything like that. If they do so, the police have the authority to arrest them.

Q: At that point had you formed an opinion that you had the authority to arrest Mr. Anthony?

. . . .

A: Yes, ma'am.

The trial court overruled defendant's general objections to this testimony.

Although opinion testimony may embrace ultimate issues in a case, the opinion should not be phrased using a legal term of art carrying a specific legal meaning not readily apparent to the witness.

*State v. Rose*, 327 N.C. 599, 602-04, 398 S.E.2d 314, 315-17 (1990). However, where the witness uses a term as a shorthand statement of fact rather than as a legal term of art or an opinion as to the legal standard the jury should apply, the testimony is admissible. *State v. White*, 340 N.C. 264, 295, 457 S.E.2d 841, 859, *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 436 (1995).

Here the questions posed to Officer Welch called upon his legal knowledge and police training. An officer is entitled to arrest a person "without a warrant or other process" if the officer has probable cause to believe the person has violated a domestic violence protective order. N.C.G.S. § 50B-4.1(b) (1999). Officer Welch described the evidence available to him at the time; paraphrased the statute in neutral terms; then gave the opinion that under the statute, the facts described to him by Mr. Belk provided probable cause to arrest defendant. In so doing, Officer Welch was not providing an interpretation of the law as forbidden in *State v. Ledford*, 315 N.C. 599, 617, 340 S.E.2d 309, 321 (1986). Instead, he was offering an explanation of his actions. This assignment of error is overruled.

[13] Defendant next argues that the court erred in admitting irrelevant evidence of a bumper sticker on the truck driven by defendant at the time of the murder. The State introduced evidence of the bumper sticker through the testimony of C.E. Putnam of the Gaston County Police Department. Officer Putnam testified that the bumper sticker read, "I don't play well with others. It seems others have a problem with losing." The trial court overruled defendant's timely objection to this evidence.

The State argues that defendant waived his right to review of this issue because the same evidence was later admitted without objection during the State's cross-examination of defendant. However, the record reflects that defendant at that time attempted to undermine the effect of Officer Putnam's previous testimony by stating, "I've lost plenty. I don't get mad and fight over it, but, I mean, I don't—I don't guess nobody [sic] likes to lose." An objecting party does not waive its objection to evidence the party contends is inadmissible when that party seeks to explain, impeach, or destroy its value on cross-examination, *State v. Adams*, 331 N.C. 317, 328, 416 S.E.2d 380, 386 (1992), and we interpret this testimony as defendant's explanation of the bumper sticker's meaning. Accordingly, defendant has preserved the right to raise this objection on appeal.

STATE v. ANTHONY

[354 N.C. 372 (2001)]

**[14]** Rule 401 of the North Carolina Rules of Evidence provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1999). The testimony regarding the bumper sticker did not go to prove the existence of any fact of consequence to the determination of defendant's guilt. In fact, there is no indication that defendant even placed the bumper sticker on the vehicle. Accordingly, Officer Putnam's testimony about the bumper sticker should not have been admitted.

However, in order to show that the trial court committed reversible error in allowing the challenged evidence, defendant must demonstrate that the admission of Officer Putnam's testimony was prejudicial. *See* N.C.G.S. § 15A-1443(a) (1999). We conclude that the erroneous admission of this testimony was not prejudicial in light of the overwhelming evidence of defendant's guilt. This assignment of error is overruled.

**[15]** Defendant next argues that the trial court erred in overruling his objection and allowing the prosecutor to ask Randy Carter on direct examination, "Did Mr. Kendall tell 911 in your presence . . . 'I think I'm trying to commit—stop somebody from getting killed?'" Defendant contends that the prosecutor was attempting to elicit impermissible hearsay. The State appears to concede error, but argues that because Mr. Carter responded, "I don't know," any error was harmless. However, because the 911 recordings, which contained Mr. Kendall's report including the above statement, were played in their entirety to the jury without objection by defendant prior to Mr. Carter's testimony, defendant has waived appellate review of this issue. "Where evidence is admitted over objection and the same evidence has been previously admitted or is later admitted without objection, the benefit of the objection is lost." *State v. Alford*, 339 N.C. 562, 570, 453 S.E.2d 512, 516 (1995). This assignment of error is overruled.

**[16]** Defendant next contends that the trial court erred in overruling his objection to particular testimony of Dr. Peter Wittenberg, the State's expert witness, during his redirect examination. Defendant argues that Dr. Wittenberg's testimony impermissibly exceeded the proper scope of redirect examination and was used simply to repeat and bolster his testimony on direct examination. During Dr. Wittenberg's redirect testimony, he stated:

Q: Dr. Wittenberg, you indicated earlier that neither of these wounds were instantly fatal; is that correct?

A: Correct.

Q: So after the first wound would it be your opinion that Ms. Anthony would be aware and conscious?

    . . . .

A: Yes. She would be conscious, yes.

Q: And would she be conscious after the second wound, also?

A: Yes.

Q: And by being conscious would [she] be aware of her surroundings and what was happening?

A: As I mentioned, both of those wounds were not fatal so she would be—for a period of time she would be aware of her surroundings. I believe, you know, she bled a little bit slower from the wound on the left side than she did on the right. The right was a more severe wound.

The trial court overruled defendant's objection to this testimony.

We have recognized that

"the calling party is ordinarily not permitted . . . to question the witness on entirely new matters" on redirect examination. *State v. Weeks*, 322 N.C. 152, 169, 367 S.E.2d 895, 905 (1988). However, the decision whether to allow testimony on redirect examination involving matters beyond the scope of the witness' testimony on direct and cross-examination is a matter left to the sound discretion of the trial court.

*State v. Barton*, 335 N.C. 696, 708, 441 S.E.2d 295, 301 (1994). Our review of the transcript reveals that defendant asked Dr. Wittenberg on cross-examination whether the wounds inflicted on the victim were of equal severity. The State was entitled to address on its redirect examination evidence first elicited by defendant during his cross-examination. *See, e.g., State v. Bright*, 320 N.C. 491, 495, 358 S.E.2d 498, 500 (1987). Accordingly, we discern no impropriety in the State's questions about the wounds. Although defendant did not seek information about the length of time the victim would remain conscious, the State on redirect asked only three questions pertaining to this topic, and one of the witness' answers was only partially respon-

sive. Because there was evidence from other witnesses that the victim remained conscious for several minutes after being shot, we do not believe that defendant was prejudiced by this abbreviated exchange between the prosecutor and Dr. Wittenberg. This assignment of error is overruled.

[17] Defendant next contends that the trial court erred in permitting Amy Mitchell, an employee of the Gaston County Clerk of Superior Court, to testify to matters surrounding the complaint and motion for a domestic violence protective order filled out by Semantha Anthony before her murder. Defendant argues that Ms. Mitchell lacked the personal knowledge required to describe in general terms what would happen in court in a case involving a domestic violence protective order, much less the case instituted by the victim. None of defendant's objections to Ms. Mitchell's testimony related to the witness' lack of personal knowledge.

Ms. Mitchell testified that she was a deputy clerk and was familiar with procedures relating to 50B orders. When asked, she described how such orders are handled in court. We have stated that

> [u]nder the Rules of Evidence, a witness may testify as to any relevant matter about which he has personal knowledge. N.C.G.S. § 8C-1, Rule 602 (1992). Furthermore, a lay witness may testify as to his or her opinion, provided that the opinion is rationally based upon his or her perception and is helpful to the jury's understanding of the testimony. N.C.G.S. § 8C-1, Rule 701 (1992).

*State v. Strickland*, 346 N.C. 443, 460-61, 488 S.E.2d 194, 204 (1997), *cert. denied*, 522 U.S. 1078, 139 L. Ed. 2d 757 (1998). Applying these factors to the case at bar, we conclude that Ms. Mitchell's testimony was competent and helpful to the jury. Although defendant argues that she lacked personal knowledge, he cites no testimony to support this contention. It is apparent from Ms. Mitchell's testimony that she did possess personal knowledge of such procedures. This assignment of error is overruled.

[18] By his next assignment of error, defendant contends that the trial court erred in sustaining numerous objections raised by the State during direct examination of defendant's expert witness Dr. Roy Mathew. We address these objections *seriatim*.

Defendant questioned Dr. Mathew as to whether a genetic link to alcoholism exists and whether defendant was predisposed to alco-

holism. The court sustained the State's objections to these questions and also sustained the State's objections to defendant's questions as to whether Dr. Mathew was personally aware of cases where Xanax had created a violent reaction in those who had taken it. Finally, the court sustained the State's objections to defendant's questions of Dr. Mathew pertaining to certain aspects of a letter to the editor in the *American Journal of Psychiatry*. Defendant contends that the testimony sought was within the general theory of addiction medicine or the facts of the case and that the letter in question was one document that Dr. Mathew testified contributed to his opinion in the case. As to each series of questions, defendant made no offer of proof as to what Dr. Mathew's answers would have been had he been permitted to respond to defendant's questions.

We have observed that

"in order for a party to preserve for appellate review the exclusion of eviden[ce], the significance of the excluded evidence must be made to appear in the record and a specific offer of proof is required *unless the significance of the evidence is obvious from the record. . . .* [T]he essential content or substance of the witness' testimony must be shown before we can ascertain whether prejudicial error occurred."

*State v. Mackey*, 352 N.C. 650, 660, 535 S.E.2d 555, 560 (2000) (quoting *State v. Simpson*, 314 N.C. 359, 370, 334 S.E.2d 53, 60 (1985)) (second alteration in original); *see also State v. Hardy*, 353 N.C. 122, 134, 540 S.E.2d 334, 344 (2000) (Because "defendant made no offer of proof to show the content of the excluded conversation, this Court is precluded from evaluating the import of the excluded evidence. By failing to make an offer of proof, defendant has failed to properly preserve this issue for appellate review, pursuant to N.C.G.S. § 8C-1, Rule 103(a)(2)."), *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 56 (2001). Accordingly, defendant has failed to preserve this issue for appellate review.

[19] As to the final set of objections, defendant points to questions posed to Dr. Mathew on *voir dire* as to whether he found anything significant in defendant's past. However, our review of the record indicates that the trial court did not sustain the State's objection to this question when it was asked in the presence of the jury. Instead, Dr. Mathew was permitted to give a lengthy answer in response to defense counsel's question, "Dr. Mathew, based upon your interview with the Defendant and your review of the several additional

materials provided to you, did you find anything significant in Mr. Anthony's past?" This assignment of error is overruled.

[20] In a related assignment of error, defendant contends that he was deprived of a fair trial because of the cumulative effect of the alleged errors arising from the court's rulings as to the testimony of Dr. Mathew. Because we do not find any such errors, these assignments of error are overruled.

[21] Defendant next argues that the trial court erred in excluding certain testimony of defendant's mother, Diane Kendall, regarding statements allegedly made by Semantha Anthony several hours prior to her murder. Ms. Kendall gave the following *voir dire* testimony:

Q: Ms. Kendall, just tell the Judge what Ms. Anthony told you after you arrived at her apartment and after she locked the doors. What did she tell you?

. . . .

A: Okay. She told me that she hated me and she hated me for giving birth to Todd, that he was a weakling and that he was a weak—like wimpy and that she wanted to see him dead and that she wanted to see me destroyed and bury him. She also told me that—

. . . .

Q: What else did Sandy tell you, Ms. Kendall?

A: She told me that I better not make her angry or displease her because if I did, none of us would ever see the children, we wouldn't be allowed to see the boys . . . again. She told me that all the times that she had called the police and took the Restraining Order, that she had—was going to lure Todd and that she had complete control over his mind; that he would do whatever she wanted him to do and that she was going to shoot him and she was going to kill him and that she was going to get away with it.

Q: Now did she show you a weapon?

A: She tried to in her bedroom.

Q: Did you—did you look at it?

A: No, I didn't. I did not step all the way in the bedroom when she pulled out the drawer. And I turned and went to the front door and told her to unlock the door and let me out.

. . . .

Q: Would you describe her as being scared?

A: No.

The State objected to Ms. Kendall's proposed testimony on the grounds that the testimony was hearsay that did not fit within any exception to the hearsay rule, that it was irrelevant in that defendant did not have knowledge of the full conversation, and that the only reason the testimony was being offered was to prejudice the jury against the victim. The trial court sustained the State's objections, and Ms. Kendall was not permitted to testify as to the victim's statements to her. Defendant contends that Ms. Kendall's statements were admissible to rebut evidence presented during the State's case-in-chief that Semantha was afraid of defendant.

We recently have held that "in the absence of evidence that the defendant shot the victim in self-defense, 'evidence of the victim's prior [violent act] . . . [is] not relevant to the killing of the victim.' " *State v. Lloyd*, 354 N.C. at 95, 552 S.E.2d at 612 (quoting *State v. Strickland*, 346 N.C. at 456, 488 S.E.2d at 201) (where there was no evidence that defendant shot the victim in self-defense, evidence of the victim's statements to defendant regarding her killing another man were not relevant to the killing of the victim) (alterations in original); *see also State v. Leazer*, 337 N.C. 454, 458, 446 S.E.2d 54, 56-57 (1994) (where defendants did not contend they killed in self-defense, evidence that the victim had been convicted of two prior murders would be more prejudicial than pertinent). Because defendant has not asserted self-defense either at trial or on appeal, any alleged threats the victim made to defendant's mother are not relevant to the murder of the victim. Accordingly, the trial court did not err in preventing the jury from hearing this portion of Ms. Kendall's testimony. This assignment of error is overruled.

[22] By his next assignment of error, defendant contends that the trial court impermissibly allowed defense witness Angie Thompson to testify on cross-examination that she "was told by a person that grew up with [defendant] that he would torment cats in the neighborhood and kill cats when he was growing up." The trial court overruled defendant's objections to this testimony, noting that Ms. Thompson's

statement was contained in one of the documents that defendant's expert witness, Dr. Mathew, referred during his direct examination. Defendant argues that Ms. Thompson's statement was both inadmissible hearsay and improperly prejudicial.

During direct examination of Ms. Thompson, defendant asked, "Had you ever known Todd Anthony to be violent?" to which she responded negatively. By so questioning Ms. Thompson, defendant opened the door for the State to rebut her answer. Indeed,

> "[t]he law 'wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself.'" *State v. Warren*, 347 N.C. 309, 317, 492 S.E.2d 609, 613 (1997) (quoting *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981)), *cert. denied*, 523 U.S. 1109, 140 L. Ed. 2d 818 (1998). "Where one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially." *Albert*, 303 N.C. at 177, 277 S.E.2d at 441.

*State v. McNeil*, 350 N.C. 657, 682, 518 S.E.2d 486, 501 (1999), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 321 (2000).

Moreover, prior to Ms. Thompson's testimony, Dr. Mathew, was cross-examined on the issue of whether defendant had killed cats when he was young. Specifically, Dr. Mathew testified:

Q: Now did you look at—at an interview with Angie Thompson? Is that part of the things that you looked at?

A: I do not remember all the names, there are so many of them. You are probably correct. I'd have to go through the stack. Angie Thompson?

. . . .

Q: Doesn't it state that she had heard that when Todd grew up, that Todd killed cats when he was young?

A: Yes.

Q: Did you read that?

A: Yes.

Q: And that didn't have any bearing in you reaching your opinion?

A: No. Here it says, "She had heard from guys that he grew up with." We don't know who these guys are, how reliable they are that Todd killed cats when he was young; whether he killed one cat, whether the cat was sick, whether the cat was a menace to the neighborhood. We don't have any information and killing a cat when you are young doesn't mark you as somebody with a temper problem, in my view.

Defendant did not object to this testimony. "Where evidence is admitted over objection and the same evidence has been previously admitted or is later admitted without objection, the benefit of the objection is lost." *State v. Alford*, 339 N.C. at 570, 453 S.E.2d at 516. Defendant also failed to object to the testimony of William Bush, who was asked on cross-examination, "Do you know about what [defendant] would do with cats?" Mr. Bush responded, "I don't know if he would ever kill any cats, but . . . I've heard of him taking a dog and put over in a cat— with a lot that had cats in it. The dog would get mad at the cats and, you know, kill them or hurt them or something." Accordingly, we hold that defendant has lost the benefit of his objection to Ms. Thompson's testimony on this issue. This assignment of error is overruled.

[23] Next, in three related assignments of error, defendant contends that the trial court erred by overruling his objections during the rebuttal testimony of State's witnesses Randy Carter, Officer Kevin Murphy, and Carl Barker. As to each of these witnesses, defendant argues that the prosecutor was permitted to ask questions that exceeded the proper scope of rebuttal.

Defendant first points to Randy Carter's rebuttal testimony. When Mr. Carter was called as a rebuttal witness and asked what Ms. Kendall, defendant's mother, had said to him, defendant immediately objected, arguing that the question had been asked and answered previously. The State reminded the trial court that Mr. Carter had not testified to this information previously in the State's case-in-chief, but that during defendant's case-in-chief, Ms. Kendall had testified as to what she told Mr. Carter on the date in question. After instructing the parties to avoid repetition, the trial court determined that the questioning was a proper rebuttal area. Mr. Carter then testified:

Q: Mr. Carter, what did Ms. Kendall say to you at your house when she came over to your house on April the 15th, 1997?

A: Just to go over there and see if I could talk to Todd, settle him down.

Q: And why did she say she wanted you to go settle him down?

. . . .

A: Because he was upset.

Q: And did she say what he was saying over there?

. . . .

A: No.

Q: She didn't?

A: No, she didn't.

Q: Did you make a statement to the investigator for the Public Defender's Office?

. . . .

A: Could you repeat it again?

Q: Did you make a statement to an investigator, Ross English, for the Public Defender's Office—for the Defense counsel?

A: I don't recall.

Q: Do you recall Ross English coming to talk to you at your home?

A: No, he didn't.

Q: He didn't. Did he talk to you over the phone?

A: Yes, he did.

Q: And did you tell Mr. English that Ms. Kendall asked you to go over to her house to talk to Mr. Anthony to calm him down?

A: Yes.

Q: And that Mr. Anthony was saying he was going to kill his wife?

. . . .

A: No, I didn't, not that part, no. Nothing about killing a wife; no.

Q: She didn't say anything about him committing suicide?

A: No.

. . . .

Q: I'll show you what's been marked as State's Exhibit 65 and ask you to look over and read it.

. . . .

Q: Does that refresh your memory?

A: Somewhat, yes.

Q: Did Ms. Kendall tell you that Todd Anthony was threatening to kill his wife and that's why she wanted you to go over to the house to talk to him?

. . . .

A: I do not recall. As soon as she asked me to go over there, I ran over there to him.

Q: You do not recall.

A: No, I do not.

Defendant objected seven times during this questioning, and the trial court overruled each objection.

Defendant next objected to the rebuttal testimony of Officer Kevin Murphy, in which Officer Murphy described a domestic violence call he received on 16 March 1997 involving defendant and the victim:

Q: Were you so employed on-duty on March the 16th, 1997?

A: Yes, I was.

Q: And on that date, did you have reason to go to 5250 Hickory Grove Road?

A: Yes, I did.

Q: And what was the reason for your call on March 16th to 5250 Hickory Grove Road?

. . . .

A: On that date we were dispatched out to that residence in reference to a domestic between a man and his wife.

Q: What do you mean by a domestic?

A: The call came in to our Communications Center that a female had called in—

. . . .

Q: What was—why were you dispatched to 5250 Hickory Grove Road?

A: We were dispatched there to where a female had called in and stated that there was—

. . . .

A: Her husband was there. She and her husband were having a domestic, there was an argument, and there was a gun involved in which he had at the time. And, therefore, we responded to that residence.

Defendant objected three times during this questioning; however, none of the objections raised the argument he now presents, that the questioning went beyond the scope of proper rebuttal testimony. The trial court overruled defendant's objections.

Finally, defendant objects to the testimony of his former co-worker, Carl Barker, who described an alleged extramarital affair between defendant and Tammie Meroney:

Q: Did you ever talk to Mr. Anthony about what his relationship with Ms. Meroney was?

A: Yes, ma'am.

Q: What did Mr. Anthony tell you his relationship was with Ms. Meroney?

. . . .

A: He said that he had met her.

Q: Did he say anything that they were doing?

. . . .

A: Yes, ma'am.

Q: What did he say, sir?

A: He said they went off together.

Q: Did he say what they did when they went off together?

A: Yes, ma'am.

Q: What did he say, sir?

A: He said they had sex.

Although defendant objected twice to this testimony, neither objection was based on the contention that the testimony exceeded the proper scope of rebuttal testimony. The trial court overruled defendant's objections.

This issue is governed by section 15A-1226 of the North Carolina General Statutes, which provides:

(a) Each party has the right to introduce rebuttal evidence concerning matters elicited in the evidence in chief of another party. The judge may permit a party to offer new evidence during rebuttal which could have been offered in the party's case in chief or during a previous rebuttal, but if new evidence is allowed, the other party must be permitted further rebuttal.

(b) The judge in his discretion may permit any party to introduce additional evidence at any time prior to verdict.

N.C.G.S. § 15A-1226 (1999). This statute "is clear authorization for a trial judge, within his discretion, to permit a party to introduce additional evidence at any time prior to the verdict." *State v. Quick,* 323 N.C. 675, 681, 375 S.E.2d 156, 159 (1989).

Our review of the record indicates that the challenged questions posed to these rebuttal witnesses were properly formulated to rebut matters presented during defendant's case-in-chief. *See State v. Johnston,* 344 N.C. 596, 605, 476 S.E.2d 289, 294 (1996) ("The State has the right to introduce evidence to rebut or explain evidence elicited by defendant although the evidence would otherwise be incompetent or irrelevant."). The questions presented to Mr. Carter were intended to highlight inconsistencies in Ms. Kendall's testimony about what she told Mr. Carter shortly before the murder. The testimony of Officer Murphy addressed defendant's own testimony in which he stated that he was good to the victim and that although they argued some, he "was scared to argue" with her. The domestic violence incident of 16 March 1997 also was presented on cross-examination of defendant, and Officer Murphy's testimony rebutted defendant's statements that he "did not do anything to [the victim]" on that date. Finally, Mr. Barker's testimony rebutted defendant's

statements that he was faithful during his marriage to the victim and that it was the victim who had extramarital affairs.

In addition, it appears from the record that the quoted rebuttal testimony of witnesses Carter and Murphy would have been admissible on direct examination. *See* N.C.G.S. § 15A-1226. "It is within the trial judge's discretion to admit evidence on rebuttal which would have been otherwise admissible, and the appellate courts will not interfere absent a showing of gross abuse of discretion." *State v. Carson*, 296 N.C. 31, 44, 249 S.E.2d 417, 425 (1978). Furthermore, there is nothing in the record that suggests that defendant was prevented from presenting additional rebuttal evidence. *State v. Quick*, 323 N.C. at 682, 375 S.E.2d at 159. We hold that the trial court did not abuse its discretion in allowing the State to question these rebuttal witnesses.

These assignments of error are overruled.

[24] In his next assignment of error, defendant argues that the State's questions to one of its rebuttal witnesses, Dr. Robert Rollins, "included an assumption that the jury found one or the other State witness[es] credible regarding certain facts[] to determine whether that affected [Dr. Rollins'] opinion as to the Defendant's 'ability to form specific intent on April 15th.' " Defendant contends that the State's questions were impermissible because hypothetical questions can be posed only to an expert who has not examined defendant, that Dr. Rollins' responses were too equivocal to have probative value, and that Dr. Rollins' responses impermissibly embraced legal terms.

Examples of questions asked of Dr. Rollins to which defendant objects include:

Q: Now assuming, Dr. Rollins, that the jury believes an officer that testified that the Defendant said immediately after this incident, "One of the bullets was meant for me and the old man confronted me, so I shot him, too," does that affect your opinion as to Mr. Anthony's ability to form specific intent on April 15th?

. . . .

Q: Let's assume the jury finds that a police officer is credible when he states that he handcuffed Mr. Anthony and heard him say, "I shot her twice, is she all right"; and then Mr. Anthony was advised of his rights and asked, "You shot your wife, also," and he

replied, "Yes, sir," how, if at all, does that affect your opinion as to whether or not Mr. Anthony had the specific intent and ability to plan on April 15th, 1997?

. . . .

Q: Dr. Rollins, assume the jury finds that approximately three weeks before the murder that he states to a friend of his who owns a fishing establishment that, "I am going to kill her," how, if at all, does that affect your opinion that Mr. Anthony was able to form specific intent and have the ability to plan on April 15th, 1997?

Throughout this questioning, defendant made general objections, which the trial court overruled.

"[A]n expert witness may express an opinion based on facts within his own knowledge or based on facts not within his knowledge but incorporated into hypothetical questions." *State v. Young*, 312 N.C. 669, 679, 325 S.E.2d 181, 188 (1985). Hypothetical questions "should include only those facts supported by the evidence already introduced or those facts which a jury might logically infer from the evidence." *State v. Boone*, 302 N.C. 561, 566, 276 S.E.2d 354, 358 (1981). Such questions "should not contain repetitions, slanted or argumentative words or phrases." *Id.* In addition, a hypothetical question must be "sufficiently explicit for the witness to give an intelligent and safe opinion." *State v. Dilliard*, 223 N.C. 446, 448, 27 S.E.2d 85, 87 (1943).

Defendant does not allege that the facts were misstated in the hypothetical questions posed to Dr. Rollins. Instead, he argues that hypothetical questions should not be asked to an expert who has interviewed a defendant. However, we find no authority for defendant's contention, and defendant points us to none. *See State v. Boone*, 302 N.C. at 566, 276 S.E.2d at 358 (hypothetical questions posed to expert who had interviewed criminal defendant). After a review of the ten hypothetical questions posed to Dr. Rollins, we conclude that they were based upon facts supported by the evidence. In addition, we conclude that Dr. Rollins' answers were not so equivocal as to render them without probative value. In fact, all of his answers were certain and consistently reflected his opinion "that Mr. Anthony was able to make plans and carry out actions." In addition, these responses did not improperly embrace legal terms. *State v. Hedgepeth*, 330 N.C. 38, 46, 409 S.E.2d 309, 314 (1991) (no error in

admission of Dr. Rollins' testimony that defendant was capable of forming the specific intent to kill). This assignment of error is overruled.

[25] Defendant argues that the cumulative effect of evidentiary rulings during the guilt phase of his trial entitles him to a new trial. In light of the great weight of evidence against defendant presented at trial, we hold that the combined effect of any erroneous evidentiary rulings was not prejudicial to defendant. This assignment of error is overruled.

[26] In his next assignment of error, defendant contends that the trial court failed to intervene *ex mero motu* during the prosecutor's guilt phase closing arguments. First, defendant specifies a portion of the prosecutor's argument that refers to the testimony of Mr. Fitcher, who was at the scene of the murder and stayed with the victim until she was removed by emergency personnel: "[Defendant] tells you that Ms. Anthony wasn't a good mother, but the last breath from her mouth was, 'take care of my boys.'" Defendant contends that the prosecutor here inaccurately paraphrased Mr. Fitcher's testimony. Second, defendant calls our attention to a portion of the prosecutor's argument that refers to the jury's role in the case:

> Ladies and gentlemen, you are the voice of this community. You have sat here and you have heard the evidence and you have listened patiently. I ask, ladies and gentlemen, that you tell Mr. William Todd Anthony that the citizens of Gaston County will not stand for this behavior; that this community and this county will not tolerate people who decide to blow other people's lives away because they're not getting their way.

Defendant claims that the prosecutor inappropriately appealed to the jury's emotions in making such an argument.

Because defendant did not object to either argument, the standard of review is whether "the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*." *State v. Mitchell*, 353 N.C. 309, 324, 543 S.E.2d 830, 839, *cert. denied*, —— U.S. ——, —— L. Ed. 2d —— (Oct. 29, 2001) (No. 01-6002). "To establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999). "[T]he impropriety of the argument must be

gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it." *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979).

As to the prosecutor's recitation of Mr. Fitcher's testimony, we have held that "[c]losing argument may properly be based upon the evidence and the inferences drawn from that evidence." *State v. Diehl*, 353 N.C. 433, 436, 545 S.E.2d 185, 187 (2001). Here, Mr. Fitcher testified that the victim said, "Take care of my boys," as she lay dying in front of her parents' home. The prosecutor's argument to the jury quoted Mr. Fitcher's testimony verbatim and therefore was properly based on the evidence at trial.

As to the prosecutor's second argument, we have held that it is not improper for a prosecutor to argue that the jurors " 'are the voice and conscience of the community,' " *State v. McNeil*, 350 N.C. at 687-88, 518 S.E.2d at 505 (quoting *State v. Brown*, 320 N.C. 179, 204, 358 S.E.2d 1, 18, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987)). Here, the prosecutor merely reminded the jury that it was the voice of the community, and we consistently have upheld such arguments on appeal. *See, e.g., State v. Peterson*, 350 N.C. 518, 531, 516 S.E.2d 131, 139 (1999), *cert. denied*, 528 U.S. 1164, 145 L. Ed. 2d 1087 (2000); *State v. Locklear*, 349 N.C. 118, 153, 505 S.E.2d 277, 297 (1998), *cert. denied*, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999). Accordingly, the trial court did not err in failing to intervene *ex mero motu* during these portions of the prosecutor's closing argument. This assignment of error is overruled.

[27] Finally, defendant argues that the evidence was insufficient to support the trial court's instruction on flight. The trial court's instruction was in accord with the North Carolina pattern jury instructions as follows:

Now, further, members of the jury, the State contends and the defendant denies that the defendant did flee the scene. Now, evidence of flight may be considered by you together with all the other facts and circumstances in this case in determining whether the combined circumstances amount to an admission or show a consciousness of guilt. However, proof of this circumstance, that is flight, is not sufficient in itself to establish the defendant's guilt. Further, this circumstance has no bearing on the question of whether the defendant acted with premeditation

and deliberation. Therefore it must not be considered by you as evidence of premeditation and deliberation.

N.C.P.I.—Crim. 104.36 (1994). During the charge conference defendant objected to the trial court's giving a flight instruction.

"[A] trial court may not instruct a jury on defendant's flight unless 'there is some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged.'" *State v. Levan*, 326 N.C. 155, 164-65, 388 S.E.2d 429, 433-34 (1990) (quoting *State v. Irick*, 291 N.C. 480, 494, 231 S.E.2d 833, 842 (1977)). "Mere evidence that defendant left the scene of the crime is not enough to support an instruction on flight. There must also be some evidence that defendant took steps to avoid apprehension." *State v. Thompson*, 328 N.C. 477, 490, 402 S.E.2d 386, 392 (1991); *see also State v. Grooms*, 353 N.C. 50, 80, 540 S.E.2d 713, 732 (2000) (noting that "[t]he relevant inquiry is whether the evidence shows that defendant left the scene of the crime and took steps to avoid apprehension"), *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 54 (2001).

The evidence presented in this case, when considered in a light most favorable to the State, was sufficient to warrant the trial court's instruction on flight. After shooting Semantha and her father in front of witnesses, defendant immediately entered his car and quickly drove away from the crime scene without rendering any assistance to the victims or seeking to obtain medical aid for them. Defendant passed Mount Holly Police Officer D.B. Duckworth who was en route to the scene of the shooting in response to a dispatcher's call, but did not flag the officer down. Only later did Mr. Carter, who was taking defendant to the police station, stop an officer so defendant could surrender. We hold that this evidence was sufficient to establish that defendant did more than merely leave the scene of the crime. *See State v. Lloyd*, 354 N.C. at 120, 552 S.E.2d at 626 (trial court did not err in instructing jury on flight where defendant left crime scene hurriedly without providing medical assistance to the victim and soon thereafter called the Burlington Police Department to turn himself in); *State v. Reeves*, 343 N.C. 111, 113, 468 S.E.2d 53, 55 (1996) ("In this case, there was evidence tending to show that defendant, after shooting the victim, ran from the scene of the crime, got in a car waiting nearby, and drove away. This is sufficient evidence of flight to warrant the instruction."); *State v. Sweatt*, 333 N.C. 407, 419, 427 S.E.2d 112, 119 (1993) (no error in trial court's instruction on flight

where "[t]he State presented evidence that shortly after the victim was murdered, defendant passed Officer Foley on the highway traveling at a very high rate of speed. This was evidence from which the jury could draw a reasonable inference that defendant fled the scene."). Furthermore, the trial court's instruction accurately informed the jury that proof of flight alone was insufficient to establish guilt and would not be considered as evidence of premeditation and deliberation. *State v. Grooms*, 353 N.C. at 81, 540 S.E.2d at 732. Accordingly, the trial court properly instructed the jury on flight. This assignment of error is overruled.

Based upon the foregoing, we find no prejudicial error in the guilt-innocence phase of defendant's trial.

## CAPITAL SENTENCING PROCEEDING

[28] In his first assignment of error relating to his capital sentencing proceeding, defendant contends that the trial court erred in allowing the prosecutor to make an improper jury argument at the penalty proceeding, during which defendant claims the prosecutor asked jurors to put themselves in the place of Semantha Anthony. The prosecutor argued to the jury:

Now I'm going to start the watch and I want you to be thinking, ladies and gentlemen, thinking of what she is going through. This five minutes was the last five minutes of her life. And, ladies and gentlemen, she could have lived ten minutes, Dr. Wittenburg said five to ten minutes. I don't want to make you sit here for that long. And when you go back in the deliberation room, ladies and gentlemen, you may think, I can't believe that [prosecutor] made us sit there for five minutes. But think, when you remember that, that's Sandy laying [sic] on the ground agonizing, in pain, hurting, suffering, feeling her life's blood draining from her.

I'm going to start it in the first minutes of her death. She's still trying to breathe, ladies and gentlemen, burning, searing pain in her chest and in her back. Somewhere in there she hears boom, a third shot; Is that my dad or is that my mom? This hurts so bad, I can't breathe. I've never felt this before. I've never felt this, this hurt, this is killing me. She's probably thinking at this point, Am I going to die? That's the first minute of her death; the first minute of the last five minutes of her life.

Maybe as she's laying there now in pain, she's thinking [about her children]. I remember when we went to McDonald's, I remem-

ber when we went to the park. And then maybe she's thinking, I don't want to die, I don't want to die. I want to see [my children] become teenagers. I want to see them have their own families. This is hurting so bad, I can't breathe. Maybe by now some people have come over to her and they're rubbing her face and they're telling her, help is on the way, Sandy, hang in, Sandy. She goes, I'm trying, I'm trying really hard to hang in here, but it's hard. It hurts and I can't breathe very well. Mr. Fitcher, as he told you, he's sitting there going, "Sandy, you've got to stay for the boys. Who's going to raise the boys?" And she says, that's what I've been thinking of. And all she can get out is, take care of my boys, take care of my boys. I'm dying. By now don't you think she knows? I'm dying.

Ladies and gentlemen, as she's laying there feeling the pain, she's got two minutes left. Can you imagine that as she's laying there what's going through her mind? What goes through a person's mind the last two minutes of their life? Five minutes is a long time when you're dying isn't it. She's got a minute and a half left. The pain is not getting any better, it's getting worse. Probably at this point there's so much blood gone that she can't talk any longer. She's trying, she's moving her lips, she's trying to say whatever it is she feels. She's probably hoping and praying that her boys are going to be all right without her. She's still thinking, "I don't want to die." She's still trying to breathe, making a concerted effort to breath; what you and I take for granted. She has 50 seconds left to live, ladies and gentlemen. Twenty seconds left to live. This is when her life is over. To that last breath, ladies and gentlemen. That's a long time to lay there and know that you are dying.

Because defendant failed to object to this argument at trial, our review is limited to whether the argument was so grossly improper as to warrant the trial court's intervention *ex mero motu. State v. Cummings,* 353 N.C. 281, 296-97, 543 S.E.2d 849, 859, *cert. denied,* —— U.S. ——, 151 L. Ed. 2d 286 (2001). Under this standard, "[o]nly an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Richardson,* 342 N.C. 772, 786, 467 S.E.2d 685, 693, *cert. denied,* 519 U.S. 890, 136 L. Ed. 2d 160 (1996). "[D]efendant must show that the prosecutor's comments so infected the trial with

unfairness that they rendered the conviction fundamentally unfair." *State v. Davis*, 349 N.C. at 23, 506 S.E.2d at 467.

Although "[a]n argument 'asking the jurors to put themselves in place of the victims will not be condoned,' " *State v. McCollum*, 334 N.C. 208, 224, 433 S.E.2d 144, 152 (1993) (quoting *United States v. Pichnarcik*, 427 F.2d 1290, 1292 (9th Cir. 1970)), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994), "this Court has consistently allowed arguments where the prosecution has asked the jury to imagine the emotions and fear of a victim," *State v. Wallace*, 351 N.C. 481, 529, 528 S.E.2d 326, 356, *cert. denied*, 531 U.S. 1018, 148 L. Ed. 2d 498 (2000); *see also State v. Grooms*, 353 N.C. at 82, 540 S.E.2d at 733 (noting that "we have previously reviewed closing arguments that suggested what a victim may have been thinking as he or she was dying and concluded that they were not grossly improper"). Arguments urging the jury to appreciate the circumstances of the crime also have been approved by this Court. *State v. Gregory*, 340 N.C. 365, 426, 459 S.E.2d 638, 673 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996); *see also State v. Artis*, 325 N.C. at 323-25, 384 S.E.2d at 496-97 (no error where prosecutor asked jurors to hold their breath for as long as they could over four-minute period so they could understand dynamics of manual strangulation).

In the present case, the prosecutor focused on what Semantha may have been thinking as she lay dying. The prosecutor's argument was based upon the evidence at trial and did not manipulate or misstate the evidence, nor did it urge the jurors to put themselves in Semantha's place. In a similar case, *State v. Jones*, 346 N.C. 704, 487 S.E.2d 714 (1997), the prosecutor described what the victim may have seen and felt as she was being murdered and asked the jury to imagine what she may have been thinking during the five-minute period after the defendant inflicted her wounds. We held that the prosecutor's description of what the victim's thoughts may have been was based on evidence presented at trial, and, citing *State v. King*, 299 N.C. 707, 264 S.E.2d 40 (1980), we concluded that the prosecutor's argument was not so grossly improper as to require the trial court to intervene *ex mero motu*. *State v. Jones*, 346 at 714, 487 S.E.2d at 720-21; *see also State v. Grooms*, 353 N.C. at 82-83, 540 S.E.2d at 733 (no error for trial court to fail to intervene *ex mero motu* where prosecutor described what victim may have been thinking and pain she was experiencing during rape and murder because argument was based on evidence at trial and prosecutor did not ask jurors to put themselves in place of victim); *State v. Cummings*, 352 N.C. 600, 622,

536 S.E.2d 36, 52 (2000) (prosecutor's argument as to what victim was thinking at time of death was not improper because it was fairly premised on testimony of witnesses who found victim's body and did not misstate the evidence), *cert. denied*, —— U.S. ——, 149 L. Ed. 2d 641 (2001); *State v. Elliott*, 344 N.C. 242, 274-75, 475 S.E.2d 202, 216-17 (1996) (trial court did not err by failing to intervene *ex mero motu* where prosecutor got on table, lying on his stomach, with legs up and arms behind his back, and described what child victim may have been thinking as defendant beat her in "punishment position"), *cert. denied*, 520 U.S. 1106, 137 L. Ed. 2d 312 (1997). Accordingly, we hold here that the trial court did not err in failing to intervene *ex mero motu* during the prosecutor's argument to the jury. This assignment of error is overruled.

**[29]** In his next argument, defendant contends that the trial court erred in sustaining the State's objection to portions of his closing argument in which his counsel sought to read to the jury facts from a published North Carolina Supreme Court case regarding the especially heinous, atrocious, or cruel aggravating circumstance, N.C.G.S. § 15A-2000(e)(9) (1999). Specifically, defendant's counsel argued to the jury:

> [The prosecutor] stood before you for five minutes talking to you about suffering and pain, whatever she imagined was taking place with Sandy Anthony during the last moments of her life. In the case of State vs. Hamlette, [302 N.C. 490, 504, 276 S.E.2d 338, 347 (1981),] the North Carolina Supreme Court said, "According to the evidence in the present case, Defendant, after riding around and drinking beer most of the evening, saw the victim and shot him three times from behind—"

At this point, the State objected and made a motion to strike, and the trial court sustained the objection and granted the motion to strike. Defendant's counsel continued:

> The Court went on to talk about that and said, "This was heinous, but not especially heinous, within the meaning of that term as used in the statute." It went on to say, "In comparison with other capital cases we have decided, it was not—"

The State again objected, and the trial court again sustained the objection, telling the jury that defense counsel could "read the law, but not the facts."

Section 7A-97 of the North Carolina General Statutes, entitled "Court's Control of Argument," provides that "[i]n jury trials the whole case as well of law as of fact may be argued to the jury." N.C.G.S. § 7A-97 (1999). In interpreting N.C.G.S. § 84-14, the predecessor to the current statute, we held:

> N.C.G.S. § 84-14 grants counsel the right to argue the law to the jury which includes the authority to read and comment on reported cases and statutes. *State v. Irick*, 291 N.C. 480, 231 S.E.2d 833 (1977). There are, however, limitations on what portions of these cases counsel may relate. For instance, counsel may only read statements of the law in the case which are relevant to the issues before the jury. In other words, "the whole *corpus juris* is not fair game." *State v. McMorris*, 290 N.C. 286, 287, 225 S.E.2d 553, 554 (1976). Secondly, counsel may not read the facts contained in a published opinion together with the result to imply that the jury in his case should return a favorable verdict for his client. *Wilcox v. [Glover Motors Inc.]*, 269 N.C. 473, 153 S.E.2d 76 (1967). Furthermore, counsel may not read from a dissenting opinion in a reported case. *See Conn v. [Seaboard Air Line Ry. Co.]*, 201 N.C. 157, 159 S.E. 331 (1931). Consequently, these limitations show that simply because a statement is made in a reported decision does not always give counsel the right to read it to the jury in his closing argument under N.C.G.S. § 84-14.

*State v. Gardner*, 316 N.C. 605, 611, 342 S.E.2d 872, 876 (1986); *see also State v. Braxton*, 352 N.C. 158, 222, 531 S.E.2d 428, 465 (2000) ("The facts of . . . other cases are not pertinent to any evidence presented in this case and are, thus, improper for jury consideration."), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001).

Here, we hold that defendant's attempt to read the facts from *State v. Hamlette*, 302 N.C. 490, 276 S.E.2d 338, along with the holding in that case for the purpose of urging the jury to not find the especially heinous, atrocious, or cruel aggravating circumstance was improper. Accordingly, the trial court did not err in sustaining the State's objections in this regard. This assignment of error is overruled.

[30] Defendant next argues that the trial court improperly submitted to the jury as an aggravating circumstance that the "murder was committed to disrupt or hinder the lawful exercise of a governmental function." *See* N.C.G.S. § 15A-2000(e)(7). At trial, the trial court instructed the jury as to this circumstance:

"Was this murder committed to disrupt or hinder the lawful exercise of a governmental function?" A murder is committed for such purpose if the Defendant's purpose at the time he killed is, by that killing, to disrupt or hinder the exercise by some branch or agency of government or some lawful function, specifically in this case, the proceeding in the District Court on the Domestic Violence Order.

"In determining whether there is sufficient evidence to submit an aggravating circumstance, the trial court must consider the evidence in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom." *State v. Carter*, 342 N.C. 312, 323, 464 S.E.2d 272, 279 (1995), *cert. denied*, 517 U.S. 1225, 134 L. Ed. 2d 957 (1996). " 'If there is substantial evidence of each element of the [aggravating] issue under consideration, the issue must be submitted to the jury for its determination.' " *State v. Moose*, 310 N.C. 482, 494, 313 S.E.2d 507, 516 (1984) (quoting *State v. Stanley*, 310 N.C. 332, 347, 312 S.E.2d 393, 401 (1984) (Martin, J., dissenting)).

Here, a domestic violence protective order had been issued after Semantha filed a domestic violence complaint against defendant. Semantha was scheduled to return to court on 16 April 1997, the morning after her murder, to obtain an extension of the order. Defendant was aware of this hearing. He testified that he had hired an attorney to represent him in the separation and had asked the attorney to have the date of the hearing on the domestic violence order changed so he could have scheduled surgery. Statements made by defendant both before and after shooting Semantha reflect his belief that she was keeping the children from him. In addition, a restraining order to prevent defendant from approaching Semantha before the hearing was served on him at his place of employment, so upsetting him that he ripped the papers up and threw the pieces at the door of Semantha's apartment. Based on this evidence, the jury could reasonably find that one reason defendant killed his wife was to stop this proceeding. *See State v. Gray*, 347 N.C. 143, 183, 491 S.E.2d 538, 556 (1997) (no error for trial court to submit (e)(7) aggravating circumstance where defendant's murder of his wife stopped divorce proceedings), *cert. denied*, 523 U.S. 1031, 140 L. Ed. 2d 486 (1998). This assignment of error is overruled.

[31] Defendant also argues that the trial court improperly submitted to the jury the aggravating circumstance that the "murder was com-

mitted against a witness because of the exercise of her official duty as a witness." *See* N.C.G.S. § 15A-2000(e)(8). As to this circumstance, the trial court instructed the jury:

> The second aggravating—alleged aggravating circumstance reads as follows: "Was this murder committed against a witness because of the exercise of her official duty as a witness?" A murder is so committed when the victim is a witness or a former witness in a domestic violence proceeding against the Defendant; and at some time prior to the killing, the victim exercised one of her official duties as a witness testifying against the Defendant; and the fact that she had done so constituted the Defendant's motive for killing her. An official duty is anything which is necessary for a witness spouse to do as a witness in a domestic violence proceeding in the District Court.

"This Court has said that the (e)(8) aggravating circumstance reflects the General Assembly's recognition of the 'common concern' that 'the collective conscience requires the most severe penalty for those who flout our system of law enforcement.' " *State v. Burke*, 343 N.C. 129, 163, 469 S.E.2d 901, 919 (quoting *State v. Brown*, 320 N.C. at 230, 358 S.E.2d at 33), *cert. denied*, 519 U.S. 1013, 136 L. Ed. 2d 409 (1996). Here, as detailed above, Semantha previously obtained an "Ex Parte Domestic Violence Protection Order" from a judge and was scheduled to testify against defendant the day after her murder in the domestic violence hearing. Evidence at trial established that defendant had been upset for some time over his separation from Semantha and the custody of their children; even defendant's own testimony reflected his frustration and anger over these issues. In addition, the evidence established that defendant was aware that Semantha had obtained the *ex parte* order and was going to testify. Based on this evidence, we conclude that a reasonable juror could have found that one reason defendant killed his wife was because she obtained the protective order as one aspect of her official duty as a witness against him. *State v. Gray*, 347 N.C. at 183, 491 S.E.2d at 556; *State v. Long*, 354 N.C. 534, 557 S.E.2d 89 (2001).

**[32]** Nevertheless, defendant contends that the trial court erroneously erred in submitting both the (e)(7) and (e)(8) aggravating circumstances because both circumstances were based on the same evidence. Defendant's argument is well-founded. We have held that "[i]n a capital case the trial court may not submit multiple aggravating circumstances supported by the same evidence." *State v.*

*Lawrence,* 352 N.C. 1, 29, 530 S.E.2d 807, 825 (2000), *cert. denied,* 531 U.S. 1083, 148 L. Ed. 2d 684 (2001). The submission of two aggravating circumstances based upon the same evidence is impermissible "double counting." *State v. Kandies,* 342 N.C. 419, 450, 467 S.E.2d 67, 84, *cert. denied,* 519 U.S. 894, 136 L. Ed. 2d 167 (1996). "Where, however, there is separate evidence supporting each aggravating circumstance, the trial court may submit both 'even though the evidence supporting each may overlap.'" *State v. Rouse,* 339 N.C. 59, 97, 451 S.E.2d 543, 564 (1994) (quoting *State v. Gay,* 334 N.C. 467, 495, 434 S.E.2d 840, 856 (1993)), *cert. denied,* 516 U.S. 832, 133 L. Ed. 2d 60 (1995); *see also State v. Call,* 349 N.C. at 426, 508 S.E.2d at 523 ("[S]ome overlap in the evidence supporting each aggravating circumstance is permissible so long as there is not a complete overlap of evidence.").

Our research has revealed only one case in which we approved submission of both the (e)(7) and (e)(8) aggravating circumstances. *State v. Gray,* 347 N.C. at 180-81, 491 S.E.2d at 554-55. In that case, as here, a husband shot his wife. Although the evidence for submission of the (e)(7) and (e)(8) circumstances overlapped, we found no error in *State v. Gray* because the governmental function to which the (e)(7) circumstance referred was a show cause order served on the defendant for an accounting of marital monies in the parties' upcoming divorce, while the (e)(8) circumstance applied to a pending criminal case in which the victim was to be a witness against the defendant. By contrast, in the case at bar, the (e)(7) and (e)(8) circumstances both referred to the domestic violence matter previously initiated by Semantha and scheduled for hearing the day after the murder. The relationship between defendant, victim Semantha, and their children was a reason Semantha had instituted the action and was to be a witness at the upcoming hearing. Consequently, we hold that while there was sufficient evidence to support submission of either aggravating circumstance, it was error to submit both.

Nevertheless, "the erroneous submission of an aggravating circumstance in a capital sentencing procedure is not reversible *per se,* but rather, is subject to a harmless error analysis." *State v. Alston,* 341 N.C. 198, 255, 461 S.E.2d 687, 719 (1995), *cert. denied,* 516 U.S. 1148, 134 L. Ed. 2d 100 (1996). In the case at bar, the evidence indicated that defendant planned to shoot his wife, shot her twice, shot her father, and attempted to shoot her mother. As in *State v. Alston,* the jury found the murder to be especially heinous, atrocious, or cruel. *Id.* (Assuming *arguendo* that the trial court erred by submitting

the pecuniary gain and former witness aggravating circumstances, "it is unreasonable to believe that absent a finding that the victim was a former witness or that the defendant killed the victim for . . . money . . . , the jury would have ignored the fact that the defendant mercilessly and brutally killed the victim and thus would have found that the death penalty was not justified."). Although the jurors here unanimously found that the (e)(8) circumstance existed, they rejected the (e)(7) circumstance. Based upon this evidence and this record, it is unreasonable to believe that the jury would have returned a different sentencing recommendation if the trial court had submitted only one of these two circumstances.

These assignments of error are overruled.

**[33]** Defendant next contends that the trial court erred when it submitted to the jury the aggravating circumstance that the "murder [was] especially heinous, atrocious or cruel." *See* N.C.G.S. § 15A-2000(e)(9). Specifically, defendant argues that there was insufficient evidence to support submission of this aggravating circumstance.

"In determining the sufficiency of the evidence to submit an aggravating circumstance to the jury, the trial court must consider the evidence in the light most favorable to the State, with the State entitled to every reasonable inference to be drawn therefrom, and discrepancies and contradictions resolved in favor of the State." *State v. Syriani*, 333 N.C. 350, 392, 428 S.E.2d 118, 141, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). In addition, "determination of whether submission of the (e)(9) aggravating circumstance is warranted depends on the particular facts of each case." *State v. Call*, 353 N.C. at 424, 545 S.E.2d at 205.

We have held that three types of murders warrant the submission of the (e)(9) aggravating circumstance. *Id.* at 425, 545 S.E.2d at 206.

> The first type consists of those killings that are physically agonizing for the victim or which are in some other way dehumanizing. *State v. Lloyd*, 321 N.C. 301, 319, 364 S.E.2d 316, 328, *sentence vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988). The second type includes killings that are less violent but involve infliction of psychological torture by leaving the victim in his or her "last moments aware of but helpless to prevent impending death," *State v. Hamlet*, 312 N.C. [162,] 175, 321 S.E.2d [837,]

846 [(1984)], and thus may be considered "conscienceless, piti-less, or unnecessarily torturous to the victim," *State v. Brown*, 315 N.C. 40, 65, 337 S.E.2d 808, 826-27 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *and overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). The third type includes killings that "demonstrate[] an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder[s]." *Id.* at 65, 337 S.E.2d at 827.

*State v. Lloyd*, 354 N.C. at 122, 552 S.E.2d at 627-28 (alterations in original).

In the present case, defendant's murder of Semantha easily fits within the first two types of killings and displays aspects of the third. First, the evidence tended to show that Semantha's death was physically agonizing. Dr. Wittenberg testified that Semantha slowly bled to death and could have survived five to ten minutes after being shot. He also added that her wounds would be "very painful" and that she would have been conscious of her surroundings at this time.

Semantha's murder also involved psychological torture and was conscienceless. The evidence tended to show that defendant dragged Semantha by her hair in her parents' front yard while wielding a shotgun. He then shot Semantha once in the back as she tried to run from him, then shot her a second time at close range as she lay helpless, begging for her life. We have held that the shooting of a victim who is pleading not to be killed is merciless or pitiless. *State v. Pinch*, 306 N.C. 1, 35, 292 S.E.2d 203, 228 (the murder "was merciless and conscienceless in that defendant shot [the victim] as he begged and pleaded for his life"), *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *and overruled on other grounds by State v. Rouse*, 339 N.C. 59, 451 S.E.2d 543, *by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995), *and by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988). This evidence also shows that Semantha was helpless to prevent her impending death between the time when defendant first shot her and when he flipped her over to shoot her a second time. *See State v. Holman*, 353 N.C. 174, 182, 540 S.E.2d 18, 24 (2000) ("the victim would have feared for her life between the time when defendant first shot her and when he shot her the second time from his car"), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 70 U.S.L.W. 3242 (2001). In addition, defendant killed Semantha in the presence of her parents and then shot her

father, leaving Semantha uncertain of whether her father survived the attack. This certainly contributed to her psychological pain. *See State v. Syriani*, 333 N.C. at 393, 428 S.E.2d at 142 (the victim "suffered and endured psychological torture or anxiety not only for herself but for her young son who was sitting beside her trying to stop his father"). After the shootings, defendant said, "Now I can go to jail," and drove away without providing any assistance to the victims. This comment demonstrates that defendant then felt no remorse for shooting his victims.

In addition, the evidence showed that Semantha had an *ex parte* domestic violence order served on defendant shortly before her murder and made statements to several witnesses that defendant had threatened and followed her and that she feared him. Semantha even saw defendant slowly driving past the hair salon she was patronizing just hours before her murder. This evidence supports the inference that Semantha experienced psychological unease and fear before her murder. *See id.* at 393, 428 S.E.2d at 141-42 (jury could reasonably infer that victim, upon seeing defendant prior to and during the attack, endured psychological torture or anxiety where defendant had previously threatened to kill her and she had an *ex parte* domestic violence order served on him just two weeks prior to her murder).

Viewed in the light most favorable to the State, this evidence supports the trial court's submission of the (e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel. This assignment of error is overruled.

**[34]** Next, defendant argues that the trial court's definition of "mitigating circumstance" in its charge to the jury was incomplete and misleading to the jury. When instructing the jury during the sentencing proceeding, the trial court defined "mitigating circumstance" as follows:

> A mitigating circumstance is a fact or a group of facts which do not constitute a justification or excuse for a killing or reduce it to a lesser degree of crime in First-Degree Murder, but which may be considered as extenuating or reducing the moral culpability of the killing and making it less deserving of extreme punishment than other First-Degree murders.

This instruction is in accord with the North Carolina pattern jury instructions, N.C.P.I.—Crim. 150.10 (2000), and is virtually identical to the instructions approved by this Court in *State v. Williams*,

350 N.C. 1, 33, 510 S.E.2d 626, 647, *cert. denied*, 528 U.S. 880, 145 L. Ed. 2d 162 (1999). *See also State v. Cagle*, 346 N.C. 497, 510, 488 S.E.2d 535, 544, *cert. denied*, 522 U.S. 1032, 139 L. Ed. 2d 614 (1997); *State v. Harden*, 344 N.C. 542, 564, 476 S.E.2d 658, 669 (1996), *cert. denied*, 520 U.S. 1147, 137 L. Ed. 2d 483 (1997). Moreover, after the above instruction was given, the trial court additionally instructed the jury as follows:

> Our law indicates several possible mitigating circumstances; however, in considering Issue 2, it would be your duty to consider . . . as a mitigating circumstance any aspect of the Defendant's character or record or any of the circumstances of this murder that the Defendant contends is a basis for a sentence less than death and any other circumstances arising from the evidence which you deem to have mitigating value.

The jury was then instructed that it should consider "all of the mitigating circumstances listed on the form and any others which you deem to have mitigating value." These additional instructions also are in accord with the pattern jury instructions and were given in *State v. Conaway*, 339 N.C. 487, 533-34, 453 S.E.2d 824, 853-54, *cert. denied*, 516 U.S. 884, 133 L. Ed. 2d 153 (1995), and *State v. Robinson*, 336 N.C. at 121-22, 443 S.E.2d at 327-28, in which we rejected a similar argument. Defendant did not object to any of these instructions. We hold that these instructions were adequate and gave defendant the full benefit of relevant mitigating evidence.

Although defendant now argues that the State belittled his mitigating evidence during closing arguments, defendant did not assign error to this issue. In addition, defendant provides no case law in support of this contention, nor does he point to any reference in the State's closing argument where such deprecation occurred. This assignment of error is overruled.

[35] In twenty-eight related assignments of error, defendant contends that the trial court erred when it combined various nonstatutory mitigating circumstances that defendant had requested be submitted separately to the jury. The gist of defendant's argument is that the jury would have given more value to separate mitigating circumstances and that the court's combining different facets of his character and defense into single circumstances precluded the jury's full consideration of mitigating evidence. We review defendant's claims in detail.

During trial, defendant requested in writing that three statutory mitigating circumstances and thirty-four nonstatutory mitigating circumstances be submitted to the jury. At the charge conference held after the close of evidence, the trial court indicated that it would combine several of defendant's separate requests. Thereafter, the trial court submitted the three statutory mitigating circumstances in addition to the catchall circumstance and nine nonstatutory mitigating circumstances. The nonstatutory mitigating circumstances given to the jury encompassed nine categories, including: (1) defendant's good character and employment; (2) defendant's low self-esteem, intellect, and education; (3) defendant's completion requirements to receive his high-school diploma; (4) defendant's abusive upbringing; (5) the role of defendant's grandparents in his life; (6) defendant's positive parenting of his children; (7) defendant's cooperation upon and after his arrest with law enforcement; (8) defendant's remorse and good conduct in jail; and (9) defendant's support group and likelihood of committing another crime.

As to the first category, defendant included five related requests: (1) defendant is a person of good character with a good reputation in his community; (2) defendant was always willing to and did in fact, help others; (3) defendant is a trusted and well loved friend to many people; (4) defendant was gainfully employed at the time of the murder and was a good worker; and (5) defendant worked at the same job for over ten years. The trial court condensed four of the requested circumstances into the following: "That the defendant was a person of good character and reputation in his community, willing to help others and employed at the same job for over 10 years and was a good worker."[2] At least one juror subsequently found this circumstance to exist and to have mitigating value.

As to the second category, defendant requested that the trial court submit as two separate circumstances that defendant has low self-esteem and defendant is a person of limited intellect and education. The trial court combined these two circumstances into one and submitted to the jury: "That the defendant has low self esteem and is of low intellect and limited education." No juror found this circumstance to exist or to have mitigating value.

---

2. Defendant contends that the trial court also combined into this category his proffered circumstance, "Todd Anthony is a trusted and well loved friend to many people." However, our review of the record reflects that the trial court instead refused to submit this circumstance.

As to the third category, defendant requested the trial court submit as separate circumstances that defendant quit school when he was sixteen to go to work and support himself, and defendant has attempted to better himself educationally and has obtained his GED. The trial court condensed these circumstances and submitted to the jury: "That the defendant quit school when he was 15 years old and later obtained a GED." At least one juror subsequently found this circumstance to exist and to have mitigating value.

As to the fourth category, defendant requested as four separate circumstances that defendant came from a broken home, defendant was abused emotionally by his parents, defendant's mother abandoned him when he was nine years old, and defendant's father was an alcoholic who never could be a father figure to him. The trial court combined these circumstances and instructed the jury: "That the defendant came from a broken home, was abused emotionally by parents, was abandoned by mother at age 9 and his father was an alcoholic." No juror found this circumstance to exist or to have mitigating value.

Defendant made two separate requests as to the fifth category, that defendant was raised by his elderly grandparents and defendant suffered greatly when his grandparents died almost at the same time. The trial court combined these requests and submitted to the jury: "That the defendant, after age 9, was raised by his paternal grandparents and grieved at their death[s]." At least one juror found this circumstance to exist and to have mitigating value.

As to the sixth category, defendant requested four related circumstances: defendant is a good father to his children and loves them very much, defendant coached his children's sports teams, defendant taught his children to hunt and fish, and defendant has voluntarily signed over any and all property and assets that he had to a trust for his children. The trial court condensed these requests into one circumstance: "That the defendant is a good father who loves his children and coached their sports teams and taught them to hunt and fish and has placed all his assets in a trust for his children." At least one juror subsequently found this circumstance to exist and to have mitigating value.

Defendant requested three related circumstances as to the seventh category: defendant offered no resistance upon his arrest and turned himself in to the police, defendant confessed his participation in the offenses to law enforcement officers shortly after the crimes,

and defendant cooperated with law enforcement officers. The trial court distilled these requests into one: "That the defendant surrendered himself, was cooperative with law enforcement officers and confessed to the crimes involved." No juror found this circumstance to exist or to have mitigating value.

As to the eighth category, defendant requested as separate circumstances that defendant is remorseful and deeply regrets his actions on 15 April 1997, defendant has exhibited good conduct in jail following his arrest and has been a model prisoner, and defendant has exhibited religious beliefs and practices since incarceration. The trial court combined these three factors into one and submitted: "That the defendant was remorseful, regretted his actions, and exhibited good conduct in jail and practiced religious beliefs since his incarceration." At least one juror subsequently found this circumstance to exist and to have mitigating value.

Finally, as to the ninth category, defendant requested the trial court submit separately that defendant's character, habits, and mentality are such that he is unlikely to commit another crime, and defendant has a strong support network in the community. The trial court joined these circumstances and submitted: "That the defendant is unlikely to commit another crime and has support in his community." At least one juror subsequently found this circumstance to exist and to have mitigating value.

> [W]here a defendant makes a timely *written* request for a listing *in writing* on the form of possible nonstatutory mitigating circumstances that are supported by the evidence and which the jury could reasonably deem to have mitigating value, the trial court must put such circumstances in writing on the form.

*State v. Cummings*, 326 N.C. at 324, 389 S.E.2d at 80. Furthermore, "[a] jury in a capital case must 'not be precluded from considering as a mitigating factor[] any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " *State v. Meyer*, 353 N.C. at 108, 540 S.E.2d at 10 (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990 (1978)) (second alteration in original). However, we have also held that trial courts may combine related mitigating circumstances. In *State v. Greene*, 324 N.C. 1, 376 S.E.2d 430 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), the trial court refused to submit three of the

defendant's proposed circumstances to the jury as independent mitigating circumstances. We noted:

> Defendant's argument is rooted in the notion that the jury would have been more impressed with the mitigating value of the proffered evidence if it had been categorized into three separate mitigating circumstances rather than consolidated into the two statutory mitigating circumstances and the "catch-all" circumstance. We reject this "mechanical[,] mathematical approach" to capital sentencing.

*Id.* at 21, 376 S.E.2d at 442 (quoting *State v. McDougall*, 308 N.C. 1, 32, 301 S.E.2d 308, 326, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983)) (alteration in original). We also observed that "[t]he trial court recognized the danger of a numerical approach when it instructed the jury: . . . '[Y]ou are not applying a mathematical formula. . . . You may very properly emphasize one circumstance more than another in a particular case.' " *Id.* Accordingly, we held that "[t]he refusal to submit the proposed circumstances separately and independently was within the dictates of constitutional precedent and was not error." *Id.* at 21, 376 S.E.2d at 443.

Similarly, in the present case, the jury was not prevented from considering any potential mitigating evidence. The circumstances proffered by defendant were subsumed in the circumstances submitted by the trial court; in many instances, the court's language was identical to that requested by defendant. *See State v. Daughtry*, 340 N.C. 488, 523, 459 S.E.2d 747, 766 (1995) ("Trial judges may consolidate related mitigating circumstances to eliminate redundancy."), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996). Even where the language was not precisely that requested by defendant, the jury nonetheless was required to address all points proposed by defendant in his written request. Defendant was able to present evidence on each of his proffered circumstances and to argue the weight of that evidence to the jury. Furthermore, as in *State v. Greene*, the trial court carefully instructed the jury not to apply a mathematical approach:

> When deciding this issue, each juror may consider any mitigating circumstance or circumstances that the juror determines to exist by a preponderance of the evidence in Issue 2. In so doing, you are the sole judges of the weight to be given to any individual circumstance which you find whether aggravating or mitigating. You should not merely add up the number of aggra-

vating circumstances and mitigating circumstances; rather, you must decide from all the evidence what value to give each circumstance and then weigh the aggravating circumstances['] sole value against the mitigating circumstances['] sole value and finally determine whether the mitigating circumstances are insufficient to outweigh the aggravating circumstance or circumstances.

. . . .

After considering the totality of the aggravating and mitigating circumstances, each of you must be convinced beyond a reasonable doubt that the imposition of the death penalty is justified and appropriate in this case before you can answer the issue "Yes." In so doing, you are not applying a mathematical formula. For example, three circumstances of one kind do not automatically and of necessity outweigh one circumstance of another kind. You may very properly give more weight to one circumstance than another.

Finally, the jury was always free to consider any evidence under the catchall mitigating circumstance and to give that evidence mitigating value. *See State v. Meyer*, 353 N.C. at 108, 540 S.E.2d at 11; *State v. Cummings*, 352 N.C. at 645, 536 S.E.2d at 66.

These assignments of error are overruled.

[36] Defendant also challenges the trial court's failure to submit the four following nonstatutory mitigating circumstances requested by defendant: (1) defendant had to protect and care for his alcoholic father, (2) defendant was troubled and ashamed of his father's drinking problems and was emotionally ill-equipped to handle that situation, (3) defendant assumed the role of caretaker as he attempted to protect his grandparents from abuse by his father, and (4) defendant's prospect for rehabilitation is excellent. To demonstrate that the trial court erred in failing to submit his requested nonstatutory mitigating circumstances, defendant must establish that the circumstances are ones that the jury reasonably could have found to have mitigating value and that there was sufficient evidence of the existence of the circumstances to have required them to be submitted to the jury. *State v. Benson*, 323 N.C. at 325, 372 S.E.2d at 521. "Upon such showing by the defendant, the failure by the trial judge to submit such nonstatutory mitigating circumstance[s] to the jury for its determination raises federal constitutional issues." *Id.* Defendant fails to meet his

burden here because these circumstances either were not supported by sufficient evidence or were subsumed in other mitigating circumstances submitted to the jury.

As to the requested circumstance that defendant had to protect and care for his alcoholic father, defendant contends that the testimony of his aunt, Jocyln Broome, "disclosed the role . . . Defendant fulfilled in the family by buffering the trouble between his alcoholic father and grandparents." Broome testified, in pertinent part:

Q: Now you say Todd's father is your brother?

A: Yes, sir.

Q: How would you describe your brother's relationship with his son, Todd?

A: Well, my brother had a drinking problem, like it was said, and Todd was sort of caught in the middle all the time with his dad and my mom and dad. But he was—he was very respectful to my mother and daddy. He never gave them not one thing to worry about. He was always well-behaved.

Q: When you say he was in the middle, what do you mean?

A: Well, his dad drunk [sic] a lot and he would rant and rave and cuss and Todd would be always trying to protect my mom and dad from this. So he wasn't a very happy little boy.

Nothing in this testimony suggests that defendant protected his father or cared for him. Accordingly, there was insufficient evidence of the existence of this circumstance, and the trial court did not err by failing to submit it. *See State v. Strickland*, 346 N.C. at 465-66, 488 S.E.2d at 207; *State v. Daughtry*, 340 N.C. at 523, 459 S.E.2d at 765.

As to the requested circumstance that defendant was troubled and ashamed of his father's drinking problems and was emotionally ill-equipped to handle that situation, defendant claims the testimony of various family and friends "disclosed the difficulty and shame . . . Defendant felt because of his father's alcohol abuse." In addition to the testimony of Jocyln Broome quoted above, defendant cites us to testimony given by Betty Lanham, Lonnie Broome, Sheri Broome, and Melody Huff. Betty Lanham testified:

Q: What was Todd like as a child?

A: A very good child.

Q: Could you describe his relationship with his father?

A: He was kind of—he had a good relationship with his father except for when he was drinking.

Q: How would Todd react to that?

A: Nervous.

Lonnie Broome testified:

Q: Do you have occasion to know of Todd playing ball and things like that?

A: Well, yes. I coached against Todd years and years ago. I was the coach of one team and he played for this other team in Little League, which he was about ten years old maybe.

Q: Do you know how Todd felt about his father's inability to participate in those kinds of activities?

. . . .

A: Well, I believe it hurt him. I believe it hurt him to—there were so many kids—it seemed like maybe their parents did and his didn't. So he was a little envious.

Sheri Broome testified:

Q: What did you notice about the way [defendant] grew up?

A: I'm sure Todd had a bad childhood and, more or less, adulthood.

Q: Why is that?

A: Well, I know there was a lot of problems with his dad drinking. I remember a lot of them.

Finally, Melody Huff testified:

A: [Defendant's father] has been an alcoholic for many, many years. He's had a very bad alcohol problem. He's a good person, but he's got a bad problem. He quit drinking years ago, but it's still

not been good. I mean, the whole time that Todd was growing up, Tom drank and drank heavily.

. . . .

Q: Do you know how that affected Todd?

A: I know that Todd didn't want to have anything to do with alcohol and didn't. I never knew Todd to take a drink, even.

Although this testimony is sufficient to establish that defendant's father had problems with alcohol, it does not support the circumstance that defendant was ashamed and troubled by these problems or was emotionally ill-equipped to handle them. Moreover, the circumstance was subsumed by the mitigating circumstance given to the jury, "[t]hat the defendant came from a broken home, was abused emotionally by parents, was abandoned by mother at age 9, and his father was an alcoholic." "A trial court's failure or refusal to submit a defendant's proposed nonstatutory mitigating circumstances separately or independently is not error where requested mitigating circumstances are subsumed in submitted mitigating circumstances." *State v. Brewington,* 352 N.C. 489, 521, 532 S.E.2d 496, 515 (2000), *cert. denied,* 531 U.S. 1165, 148 L. Ed. 2d 992 (2001). Accordingly, we hold that any error in not submitting this circumstance was harmless.

As to the requested circumstance that defendant assumed the role of caretaker as he attempted to protect his grandparents from abuse from his father, defendant points to the above-quoted testimony of both Jocyln and Lonnie Broome and to the testimony of Debbie Hampton, a longtime neighbor of defendant's family, who testified:

Q: Could you tell—tell the jury what his relationship was with his dad when he was a young child.

A: Todd—well, Tom was an alcoholic and Todd was almost like—well, he—Mr. and Mrs. Anthony more or less raised Todd, I would say. And Tom, of course, lived there with them, but it was like they were brothers. I mean, my daughter even made a statement one day that she didn't know that Tom and Todd were father and son. She thought they were brothers.

Despite defendant's contention that this testimony supports the proffered circumstance, we find nothing in the record to indicate that defendant protected and cared for his alcoholic father. Although Ms.

Broome testified that defendant sought to keep his grandparents from hearing defendant's alcoholic father as he ranted, raved, and cursed, this testimony does not support an inference that defendant's father would have abused the grandparents but for defendant's intervention. Because the evidence was insufficient to support submission of this mitigating circumstance, we hold that the trial court properly refused to submit it.

[37] Finally, as to the requested circumstance that defendant's prospect for rehabilitation is excellent, defendant cites the testimony of Monica Steward, J.R. Hughes, and Tom Bradley, employees of the Gaston County Sheriff's Department who worked in the jail division. All three testified that defendant had been a polite and respectful inmate while at the Gaston County jail. In addition, Ms. Steward described defendant as a "model inmate" who looked out for others in the jail. Mr. Hughes described defendant as a "good, respectable inmate," and Mr. Bradley testified that defendant "would be helpful of other individuals."

This circumstance was subsumed within two circumstances submitted to the jury: "That the defendant was remorseful, regretted his actions, and exhibited good conduct in jail and practiced religious beliefs since his incarceration"; and "That the defendant is unlikely to commit another crime and has support in his community." Because "[a] trial court's failure or refusal to submit a defendant's proposed nonstatutory mitigating circumstances separately or independently is not error where requested mitigating circumstances are subsumed in submitted mitigating circumstances," *id.*, we hold that the trial court's failure to submit this circumstance was not error.

These assignments of error are overruled.

[38] In his next assignment of error, defendant contends that the trial court committed reversible error in light of *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990), when it instructed the jury that it must be unanimous in its answers to Issue Three and Issue Four on the "Issues and Recommendation as to Punishment" form. Defendant argues that the trial court's instructions misled the jury to believe that a life sentence could be imposed only upon the jury's unanimous recommendation.

Issue Three on the "Issues and Recommendation as to Punishment" form submitted to the jury provided: "Do you unanimously find beyond a reasonable doubt that the mitigating circum-

stance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance or circumstances found by you?" As to this issue, the trial court instructed the jury:

> If you unanimously find beyond a reasonable doubt that the mitigating circumstances found are insufficient to outweigh the aggravating circumstance or circumstances found, you would answer Issue 3 "Yes." If you unanimously fail to do so, you would answer Issue Number 3 "No." If you answer Issue Number 3 "No," it would be your duty to recommend that the Defendant be sentenced to life imprisonment. If you answer Issue 3 "Yes," you must consider Issue Number 4.

Issue Four on the "Issues and Recommendation as to Punishment" form provided: "Do you unanimously find beyond a reasonable doubt that the aggravating circumstance or circumstances you found is, or are, sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by one or more of you?" As to this issue, the trial court instructed the jury:

> [I]f you find beyond a reasonable doubt that the aggravating circumstances found by you are sufficiently substantial to call for the death penalty when considered with the mitigating circumstances found by one or more of you, it would be your duty to answer the issue "Yes." If you unanimously fail to so find, it would be your duty to answer the issue "No."
>
> . . . .
>
> . . . [I]t is not enough for the State to prove from the evidence beyond a reasonable doubt the existence of one or more of the aggravating circumstances. It must also prove beyond a reasonable doubt that such aggravating circumstances are sufficiently substantial to call for the death penalty. And before you may answer Issue 4 "Yes," you must agree unanimously that they are.
>
> If you answer Issue Number 4 "No," you must recommend that the Defendant be sentenced to life imprisonment. If you answer Issue Number 4 "Yes," it would be your duty to recommend that the Defendant be sentenced to death.

These instructions were correct. We analyzed this issue in *State v. McCarver*, 341 N.C. 364, 462 S.E.2d 25 (1995), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996), where we held:

In a capital sentencing proceeding, any jury recommendation requiring a sentence of death or life imprisonment must be unanimous. N.C. Const. art. I, § 24; N.C.G.S. § 15A-2000(b) (Supp. 1994). The policy reasons for the requirement of jury unanimity are clear. First, the jury unanimity requirement "is an accepted, vital mechanism to ensure that *real* and *full* deliberation occurs in the jury room, and that the jury's ultimate decision will reflect the conscience of the community." *McKoy v. North Carolina*, 494 U.S. 433, 452, 108 L. Ed. 2d 369, 387 (1990) (Kennedy, J., concurring) (emphasis added). Second, the jury unanimity requirement prevents the jury from evading its duty to make a sentence recommendation. If jury unanimity is not required, then a jury that was uncomfortable in deciding life and death issues simply could "agree to disagree" and escape its duty to render a decision. This Court has refused to make any ruling which would tend to encourage a jury to avoid its responsibility by any such device. For example, we have expressly stated that a jury instruction that a life sentence would be imposed if a jury could not unanimously agree should never be given because it would be "tantamount to 'an open invitation for the jury to avoid its responsibility and to disagree.' " *State v. Smith*, 305 N.C. 691, 710, 292 S.E.2d 264, 276 (quoting *Justus v. Commonwealth*, 220 Va. 971, 979, 266 S.E.2d 87, 92 (1980)), *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982). The jury may not be allowed to arbitrarily or capriciously take any such step which will require the trial court to *impose* or *reject* a sentence of death. *State v. Pinch*, 306 N.C. 1, 33, 292 S.E.2d 203, 227. Thoughtful and *full* deliberation in an effort to achieve unanimity has only a salutary effect on our judicial system: It tends to prevent arbitrary and capricious sentence recommendations.

Since the sentence recommendation, *if any*, must be unanimous under constitutional and statutory provisions, and particularly in light of the overwhelming policy reasons for a unanimity requirement, we conclude that any issue which is *outcome determinative* as to the sentence a defendant in a capital trial will receive—whether death or life imprisonment—must be answered unanimously by the jury. That is, the jury should answer Issues One, Three, and Four on the standard form used in capital cases either unanimously "yes" or unanimously "no."

*State v. McCarver*, 341 N.C. at 389-90, 462 S.E.2d at 39 (citations altered). In light of this unambiguous holding, this assignment of error is overruled.

[39] Defendant next argues that the jury failed to consider the statutory mitigating circumstance, "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirement of the law was impaired." *See* N.C.G.S. § 15A-2000(f)(6). The trial court submitted this circumstance to the jury, but no juror found the circumstance to exist. Defendant contends that because Dr. Mathew's testimony was uncontested, the jury must have failed to consider the circumstance at all. However, defendant never requested a peremptory instruction on the (f)(6) circumstance. Moreover, the record reveals that the evidence was not uncontroverted. Various witnesses, including Martha Belk, testified that they did not believe defendant was impaired by alcohol or any controlled substance on the day of the shootings. This lay evidence conflicted with Dr. Mathew's testimony. *See State v. Payne*, 337 N.C. at 534-35, 448 S.E.2d at 110-11 (jury's failure to find (f)(6) mitigating circumstance not arbitrary in light of fact that evidence on that circumstance was controverted and jurors could have found testimony of experts not to be inherently credible). In addition, in weighing Dr. Mathew's testimony, the jury could have considered that Dr. Mathew interviewed defendant for little more than an hour on but one occasion. *See id.*

Out of the three statutory circumstances submitted to the jury, the jury found two: that defendant has no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); and that the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2). These findings indicate that the jury considered the evidence with discrimination and did not, as defendant contends, decide the case arbitrarily. This assignment of error is overruled.

[40] In related assignments of error, defendant contends that the jury's failure to find three nonstatutory mitigating circumstances was arbitrary. At trial, the trial court submitted nine nonstatutory mitigating circumstances to the jury and gave a peremptory instruction as to each. Among the nine circumstances were the following:

> (5) That the defendant has low self esteem and is of low intellect and limited education.

. . . .

(7) That the defendant came from a broken home, was abused emotionally by parents, was abandoned by mother at age 9, and his father was an alcoholic.

. . . .

(10) That the defendant surrendered himself, was cooperative with law enforcement officers and confessed to the crimes involved.

The jury found all the nonstatutory mitigating circumstances submitted by the judge on defendant's behalf to exist with the exception of the three listed above. Although defendant concedes that the jury may have rejected these circumstances because it found that each lacked mitigating value, defendant argues that it is unconstitutional for a jury to fail to give automatic mitigating value to relevant and uncontested nonstatutory mitigating circumstances. Accordingly, defendant contends, the "jurors' rejection of this mitigating evidence was error, regardless of why they do so."

"This Court has reviewed and consistently upheld the constitutionality of a jury rejecting a nonstatutory mitigating circumstance if none of the jurors find facts supporting the circumstance *or* if none of the jurors deem the circumstance to have mitigating value." *State v. Cummings,* 352 N.C. at 647, 536 S.E.2d at 67. In *State v. Bond,* 345 N.C. 1, 478 S.E.2d 163 (1996), *cert. denied,* 521 U.S. 1124, 138 L. Ed. 2d 1022 (1997), we addressed a similar argument and held that

> [a] jury could rationally have rejected these nonstatutory mitigating circumstances on the basis that they had no mitigating value. We believe that the jury's written responses on the Issues and Recommendations form submitted to it show that it considered and rejected the mitigating circumstances. It is not our role to second-guess the jury under these circumstances. In the absence of contradictory evidence, we must assume that the jury comprehended the trial court's instructions and the Issues and Recommendations form. The fact that the jury in this case considered and rejected all of the mitigating circumstances submitted to it does not indicate a violation of defendant's constitutional rights.

*Id.* at 28-29, 478 S.E.2d at 177.

In this case, a reasonable juror could have concluded that these mitigating circumstances had no mitigating value. The fact that the

jury found six out of the nine nonstatutory mitigating circumstances submitted supports that it did consider the evidence and circumstances submitted. We will not second-guess the jury's decision.

These assignments of error are overruled.

## PRESERVATION ISSUES

Defendant raises several additional issues that he concedes have been decided against him by this Court. Defendant argues that the trial court erred in denying defendant's motion *in limine* to disclose prior criminal records of all the State's witnesses. We have held that such disclosure is not required. *State v. Walls*, 342 N.C. 1, 26, 463 S.E.2d 738, 749 (1995), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996). Defendant contends that the trial court erred in denying his motion to disclose the theory upon which the State seeks a conviction of first-degree murder. We have held that the State is not required to elect its legal theory prior to trial. *State v. Wingard*, 317 N.C. 590, 594, 346 S.E.2d 638, 641 (1986). Defendant claims that the trial court erred in denying his motion to prohibit consideration of the death penalty by the jury. We have previously found no error in the denial of such motions. *State v. Davis*, 349 N.C. at 58, 506 S.E.2d at 487. Defendant argues that the trial court erred in denying his motion to prohibit the use of the aggravating circumstance that the murder was "especially heinous, atrocious, or cruel," pursuant to N.C.G.S. § 15A-2000(e)(9). We have held that this aggravating circumstance is constitutional. *State v. Syriani*, 333 N.C. at 389, 428 S.E.2d at 139. Defendant argues that the trial court erred in denying his motion for individual *voir dire* of prospective jurors and sequestration of prospective jurors during *voir dire*. We have held that a trial court's denial of similar motions is not an abuse of discretion. *State v. Hyde*, 352 N.C. at 46, 530 S.E.2d at 286. Defendant contends the trial court improperly denied his motion to permit *voir dire* of prospective jurors regarding their conceptions of parole eligibility on a life sentence. We have previously held that this issue is not a matter properly before a jury. *State v. Billings*, 348 N.C. 169, 176, 500 S.E.2d 423, 427, *cert. denied*, 525 U.S. 1005, 142 L. Ed. 2d 431 (1998). Defendant maintains that the trial court erroneously instructed the jury that his burden of proof to establish mitigating circumstances was evidence that "satisfies you" of the existence of such a circumstance. We have previously approved similar instructions to the jury. *State v. DeCastro*, 342 N.C. 667, 697, 467 S.E.2d 653, 669, *cert. denied*, 519 U.S. 896, 136 L. Ed. 2d 170 (1996). Defendant argues that the trial court erred in

instructing the jury on Issues Three and Four that each juror "may" consider any mitigating circumstance or circumstances that he or she determines to exist. We have approved similar language as being consistent with the statutory requirements. *State v. Gregory,* 340 N.C. at 418-19, 459 S.E.2d at 668-69. Finally, defendant contends that the trial court erred in instructing the jury that it could reject nonstatutory mitigating circumstances on the grounds that the circumstances had no mitigating value. We have held that such an instruction is not error. *State v. Jaynes,* 353 N.C. 534, 564, 549 S.E.2d 179, 201 (2001).

After the briefs were filed in this case, defendant filed a "Motion to Dismiss 97 CRS 11653 For Lack Of Jurisdiction, Or, In The Alternative, To Amend Record And Brief To Include Lack Of Jurisdiction As Reason For Relief, Or, In The Alternative, Petition For Writ Of Certiorari To Consider Dismissal Of 97 CRS 11653." The basis of this filing is defendant's contention that he was not properly charged with first-degree murder because a short-form indictment was used. We will allow defendant's motion to amend the record and brief to include lack of jurisdiction as a ground for relief. However, we have held consistently that a short-form indictment is adequate to charge first-degree murder. *State v. Braxton,* 352 N.C. 158, 531 S.E.2d 428; *State v. Lawrence,* 352 N.C. 1, 530 S.E.2d 807. Accordingly, this additional assignment of error is overruled.

Defendant raises these issues for the purposes of urging this Court to reexamine its prior holdings and preserving the issues for any necessary federal *habeas corpus* review. We have considered defendant's arguments on these additional issues and find no compelling reason to depart from our prior holdings.

These assignments of error are overruled.

## PROPORTIONALITY REVIEW

[41] We now turn to our duties under section 15A-2000(d)(2), which requires that we ascertain: (1) whether the record supports the jury's findings of the aggravating circumstances in the case; (2) whether the death sentence was entered upon the influence of passion, prejudice, or other arbitrary consideration; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2). We have conducted a full and careful review of the record in this case and conclude that the evidence

STATE v. ANTHONY

[354 N.C. 372 (2001)]

entirely supports the aggravating circumstances found by the jury. In addition, we discern no suggestion that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration.

Our final responsibility is the proportionality review, in which we compare the case at bar with other cases in which we have found the death sentence to be disproportionate. *State v. McCollum*, 334 N.C. at 239, 433 S.E.2d at 161. In undertaking this review, we are mindful of several salient aspects of the case at bar. The jury found defendant guilty of first-degree murder on the basis of premeditation and deliberation but not under the theory of felony murder. The jury found three aggravating circumstances: that the murder was committed against a witness because of the exercise of her official duty as a witness, N.C.G.S. § 15A-2000(e)(8); that the killing was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and that the killing was part of a course of conduct that included crimes of violence against another, N.C.G.S. § 15A-2000(e)(11). At least one juror also found eight of the thirteen mitigating circumstances that were submitted, including that defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); and the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2). No juror found the submitted mitigating circumstance that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6). The jury also found defendant guilty of assault with a deadly weapon with intent to kill inflicting serious injury on Mr. Belk.

This Court has found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181; *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). None of these cases involve a domestic killing, and of the seven, only *State v. Benson* is somewhat factually analogous in that the defendant shotgunned the victim. However, the motive in that case was robbery, and the evidence suggested that the defendant did not intend the victim's death. Indeed, the defendant was con-

victed under the theory of felony murder. We have reviewed the other cases in which we found the death penalty disproportionate and have found that all may be distinguished from the case at bar.

Our analysis also permits an examination of cases where the death penalty has been found to be proportionate. *State v. McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. In *State v. Holman*, 353 N.C. 174, 540 S.E.2d 18, the defendant's marriage had deteriorated to the point where his wife was terrified of him. Finally, he shot her twice with a shotgun, fatally wounding her. The jury found as aggravating circumstances that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9), and that the murder was part of a course of conduct in which the defendant committed other crimes of violence against other persons, N.C.G.S. § 15A-2000(e)(11). The jury found as a statutory mitigating circumstance that the murder was committed while the defendant was under the influence of a mental or emotional disturbance. N.C.G.S. § 15A-2000(f)(2). It also found as nonstatutory mitigating circumstances that the defendant suffered from depression and that his efforts to reconcile with his wife failed. We held that the death penalty in *State v. Holman* was not disproportionate.

In *State v. Gregory*, 348 N.C. 203, 499 S.E.2d 753, *cert. denied*, 525 U.S. 952, 142 L. Ed. 2d 315 (1998), the defendant fatally shot his seventeen-year-old girlfriend, who was the mother of their eighteen-month-old child. At the same time, he shot and critically injured the victim's fifteen-year-old brother. The defendant then drove to his grandfather's house, and the grandfather drove the defendant to the police station where the defendant confessed. The defendant was found guilty on the basis of premeditation and deliberation, in addition to assault with a deadly weapon with intent to kill inflicting serious injury, and felonious breaking and entering. The jury found the course of conduct aggravating circumstance, N.C.G.S. § 15A-2000(e)(11). One or more jurors found as mitigating circumstances that the defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); that the offenses were committed while the defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6); and five other nonstatutory mitigating circumstances. We held that the death penalty imposed in *State v. Gregory* was not disproportionate.

In the case at bar, defendant shot his wife while her family watched. He inflicted a second wound while she begged for her life. He then reloaded, shot the victim's father, and attempted to shoot her mother. Abundant evidence was presented that defendant had been considering these shootings for some time. "We find it significant that in none of the cases in which this Court has found the death penalty disproportionate were there multiple victims or multiple major felonies committed during the crime." *State v. Gregory*, 348 N.C. at 213, 499 S.E.2d at 760. In addition, defendant is an adult and there is no indication in the evidence that he suffers from diminished intelligence. Finally, the especially heinous, atrocious, or cruel aggravating circumstance has been found sufficient to support the death penalty even when standing alone. *State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995).

We have considered all these factors in carrying out our " 'independent consideration of the individual defendant and the nature of the crime or crimes which he has committed.' " *State v. Robinson*, 336 N.C. at 139, 443 S.E.2d at 337 (quoting *State v. Pinch*, 306 N.C. at 36, 292 S.E.2d at 229). Based on this record, we conclude that the death penalty imposed in the case at bar is not disproportionate.

Defendant received a fair trial and capital sentencing proceeding, free from prejudicial error.

NO ERROR.